**BELO BROADCASTING
CORPORATION,
Plaintiff-Appellant,**

v.

**Jesse CLARK, Defendant-Appellee.**

**UNITED STATES of America, Plaintiff,**

v.

**Billy Wayne CLAYTON, et
al., Defendants,**

**KDFW–TV, Inc. and Quin Mathews,
Movants-Appellants.**

**Nos. 80–2169, 80–2239.**

United States Court of Appeals,
Fifth Circuit.
Unit A

Aug. 28, 1981.

Locke, Purnell, Boren, Laney & Neely, Stephen Philbin, Dallas, Tex., for plaintiff-appellant.

Mary L. Sinderson, Asst. Atty. Gen., Houston, Tex., for defendant-appellee.

Jackson, Walker, Winstead, Cantwell & Miller, Charles L. Babcock, Stephen Philbin, Dallas, Tex., for movants-appellants.

Before CHARLES CLARK and GEE, Circuit Judges, and SPEARS *, District Judge.

GEE, Circuit Judge:

As the result of a Federal Bureau of Investigation "sting" operation (the "Brilab" investigation) concerned with alleged bribery in the awarding of state employee insurance contracts, the Speaker of the Texas House of Representatives, two Austin, Texas, attorneys, and a Houston, Texas, labor official, L. G. Moore, were indicted and the first three tried and acquitted in Houston on a number of federal offenses.[1]

Prominent items of proof at trial were audiotapes of discussions between defendants and the FBI operatives. Prior to and during the criminal trial, the presiding district judge prohibited the clerk of the court, counsel, or any party from providing the news media with the tapes or copies of the tapes admitted into evidence at trial. Belo Broadcasting Corporation and station KDFW, two Dallas broadcasting stations, made separate requests to the district judge to copy these Brilab tapes for public broadcast. Both the Belo motion, made during the criminal trial, for a temporary restraining order that would have required the clerk to turn over the tapes to the broadcaster, and the KDFW "Petition for Hearing and for Vacation of Restrictions on Press and Other News Media," filed after the verdicts of acquittal, were denied by the district court. In refusing to permit the requested access, the district judge made clear his concern that broadcast of the tapes outside his courtroom would have a deleterious effect on the pending trial of defendant Moore. In his memorandum opinion rejecting Belo's request, which was incorporated by reference in his denial of the subsequent KDFW motion, the district judge wrote:

> Widespread publication of these tapes prior to trial will severely prejudice Mr. Moore's sixth amendment right to a fair trial, as well as potentially deny him rights guaranteed by the fourth and fifth amendments. Moreover, if the tapes are prematurely heard by the public, this court would be severely hampered in selecting a fair and impartial jury in the forthcoming trial.

The broadcasters' appeals have been consolidated for our consideration. We affirm the orders of the district court.

I. *Appellate Jurisdiction.*

A brief but necessary discussion of the appealability of these district court orders is

---

* District Judge of the Western District of Texas, sitting by designation.

1. L. G. Moore's trial was severed from that of the other defendants and originally set for December 1, 1980. A continuance beyond that date was granted by the district court, and from what appears in the record, the trial of defendant Moore has yet to begin. That Moore was standing trial separately was the dispositive factor in the trial court's decision that prompts this appeal.

warranted. The disposition below of KDFW's "Petition for Hearing and for Vacation of Restrictions on Press and Other News Media" is an appealable order. The petition was copied from one filed in the criminal trial of former U.S. Senator Edward Gurney, the lower court disposition of which was found by this court to be a sufficiently appealable order in *United States v. Gurney*, 558 F.2d 1202 (5th Cir. 1977).

The Belo request stands in a somewhat different light: Belo appeals from the denial of what all concerned styled a temporary restraining order ("TRO"). The disposition of a motion for a temporary restraining order is generally not appealable under 28 U.S.C. § 1292(a)(1) as an order granting, denying, or modifying an injunction. In certain circumstances the denial of a requested TRO can be considered denial of a preliminary injunction. The label appended by the requesting party or the judge is not conclusive as to its proper characterization. The central inquiry goes to the nature and scope of the hearing that precedes the denial of the motion. The denial of a so-called temporary restraining order is properly appealable when entered after a hearing in which all interested parties had an opportunity to participate, thus allowing for full presentation of relevant facts. *See Dilworth v. Riner*, 343 F.2d 226 (5th Cir. 1965).

Application of these principles to this "TRO" denial does not yield a certain result. From what appears in the transcript, the hearing on Belo's motion could not have lasted over a minute. Belo's lawyers asked for access, the judge denied it. An assistant United States attorney was present, but no occasion arose for her to address the court on behalf of the clerk as custodian of the tapes. The presence of counsel for defendants or L. G. Moore is not reflected in the record. More lawyers could have added little to this hearing; it does not appear that any facts required fuller explication. On these particular facts—a motion for which factual development was irrelevant, the hearing was not *ex parte*, and time was exceedingly short [2]—we find the denial of the TRO for access to be an order sufficiently final to endow us with jurisdiction.[3]

With both appellants properly before us, we proceed to a consideration of the substance of their positions. Because, as will appear, our conclusions place us in something of a minority among our fellow circuits, we write at greater length than explaining an affirmance of a trial court's exercise of discretion usually requires.

## II. *Constitutional Claims.*

The broadcasters assert both a constitutional and a common law right of access to the tapes. We deal first with the claimed right of constitutional derivation:[4] there is no such first amendment right. In *Nixon v. Warner Communications*, 435 U.S.

2. The immediate relief sought by Belo was contemporaneous access to the tapes. That relief is of course beyond the power of this, or any, court—the period for contemporaneity expired with the jury verdict last October. But the broadcasters' requests for access are continuing and continue to be denied. The controversy remains with us; the issue is not moot. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 2820–21, 65 L.Ed.2d 973 (1980); *United States v. Gurney*, 558 F.2d at 1207.

3. Our jurisdictional resolution is bolstered by knowledge that subsequent to the denial of its "TRO" Belo filed for a preliminary injunction seeking the identical relief in the district court; that motion languishes unanswered in the court below, indicating that in all but name the motion for this TRO served the same function as that for preliminary injunction. Once the TRO was denied, nothing remained to be done on this point in the district court. In finding three oral rulings by the trial judge to have "sufficient finality to permit appeal," this court in *United States v. Gurney*, 558 F.2d at 1207, found one important factor in "the improbability of further consideration by the trial court."

4. We do this with full recognition that constitutional issues are not to be decided unless necessary. As will be seen shortly, because of our decision on the common law right of access, consideration of the constitutional claim was unavoidable. We treat the constitutional issue out of turn in these first pages simply for our own purposes in more efficiently discussing the cases and issues.

589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), confronted with a claim identical to that made by the broadcasters here, the Supreme Court squarely rejected a claimed constitutional right of physical access to trial exhibits: "Respondents claim that *Cox Broadcasting*[5] guarantees the press 'access' to—meaning the right to copy and publish—exhibits and materials displayed in open court. This argument misconceives the holding in *Cox Broadcasting*." *Id.* at 608–09, 98 S.Ct. at 1317–18. In *Cox Broadcasting* the Court held that the press could not be prohibited from reporting what it had learned in open court and what the public was thus entitled to know. In *Warner Communications* the Court recognized the difference between the situation in *Cox Broadcasting* and the one immediately before it and now before us. Here, as in *Warner Communications*, there were "no restrictions on press access to, or publication of any information in the public domain." *Id.* at 609, 98 S.Ct. at 1318. Members of the press were allowed to listen as the tapes were played in court; transcripts were prepared and distributed for their use; reporters and broadcasters were free to report this information as they wished. All that was denied them was the right to play these tapes over the air waves; that the Constitution does not require.

The district judge here recognized, consistent with prior Supreme Court authority relied on by the Court in *Warner Communications*, that the right of access enjoyed by the press is generally no greater than that of the *public* at large.

> Thus, the issue presented in this case is not whether the press must be permitted access to public information to which the public generally is guaranteed access, but whether these copies of the White House tapes—to which the public has never had *physical* access—must be made available for copying. Our decision in *Cox Broadcasting* simply is not applicable.

435 U.S. at 609, 98 S.Ct. at 1318 (emphasis in original). As recognized by the Court in *Warner Communications*, neither the public nor the press enjoys any constitutional right of physical access to exhibits introduced in evidence at a criminal trial. Constitutional requirements are fully satisfied by the kind of untrammeled access to the information contained therein that was afforded press and public alike in this case.

Our decision in *United States v. Gurney, supra,* where we found it significant that the documents withheld from the press were not part of the public record in the criminal case, may be read as holding, in reliance on *Cox Broadcasting,* that there exists a constitutional right of physical access to and inspection of courtroom exhibits. To that extent, it must be considered overruled by *Warner Communications.* Counsel for KDFW suggested at oral argument that the subsequent Supreme Court attention to fair trial-free press questions in *Richmond Newspapers, Inc. v. Virginia, supra,* had rescued *Gurney* from obliteration by *Warner Communications.* We have carefully considered the argument that *Richmond Newspapers* has altered the firm "no constitutional right of access" holding of *Warner Communications* and thus breathed new life into the broadcasters' claim of first amendment entitlement to copy and broadcast these tapes. We find it unpersuasive.

The question before the Court in *Richmond Newspapers* was a narrow but important one: "whether the right of the public and press to attend criminal trials is guaranteed under the United States Constitution." 448 U.S. at 558, 100 S.Ct. at 2818.[6] The Supreme Court answered that question affirmatively but left us with an even narrower holding: the state court here impermissibly closed *this* criminal trial to public

---

5. In *Cox Broadcasting v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), the Court struck down as violative of the first amendment a state law that prohibited publication by the press of the names of rape victims revealed in open court.

6. Unless noted otherwise, all quotations from or citations to *Richmond Newspapers* will be to the plurality opinion of Chief Justice Burger. The derivation of certain principles from this case is a difficult task: besides the opinion by the Chief Justice, there were two concurring statements, three opinions concurring in the judgment, and a dissent.

and press alike. That the right to attend criminal trials is not absolutely guaranteed by the first amendment is indicated in the plurality opinion. In restating the question before the Court in a subsequent passage, the Chief Justice writes:

> But here for the first time the Court is asked to decide whether a criminal trial itself may be closed to the public upon the unopposed request of a defendant, without any demonstration that closure is required to protect the defendant's superior right to a fair trial, or that some other overriding consideration requires closure.

*Id.* at 2821. Similarly, in the final portion of his opinion, the Chief Justice examined the particular circumstances of this closure order, concluding, "Absent an overriding interest articulated in findings, the trial of a criminal case must be open to the public." *Id.* at 2830.[7]

> [O]ur holding today does not mean that the First Amendment right of the public and representatives of the press are absolute. Just as a government may impose reasonable time, place, and manner restrictions upon the use of its streets in the interest of such objectives as the free flow of traffic, . . . so may a trial judge, in the interest of the fair administration of justice, impose reasonable limitations on access to a trial.

*Id.* n.18.

In its historical analyses and constitutional exegesis, the Court in its several opinions

wrote sensitively of the important societal values served by open criminal proceedings: further assurance of fairness to the accused,[8] a community cathartic effect, a prophylactic benefit for the system of administration of justice,[9] among others. It is argued that these sentiments, when applied to the situation before us, resuscitate the misreading of *Cox Broadcasting* (rejected by the Court in *Warner Communications*) that animates the broadcasters' constitutional claim here. As should be apparent in our restatement of that position, we decline to find the Supreme Court to have ratified that misreading. On the basis of comments general in nature and addressed to a different problem, the Supreme Court will not here be presumed to have abandoned an only recently stated principle.

Our reading of *Richmond Newspapers* convinces us that the holding of *Warner Communications* that the press enjoys no constitutional right of physical access to courtroom exhibits remains undisturbed. Despite a gentle suggestion perhaps to the contrary,[10] we are left with the principle iterated by Justice Powell in *Warner Communications* that "[t]he First Amendment generally grants the press no right to information about a trial superior to that of the general public," 435 U.S. at 609, 98 S.Ct. at 1318, and the conclusion there reached that the Constitution grants neither press nor public the right to physical access to courtroom exhibits.[11] Though four justices dis-

---

7. To the same effect, *see* 100 S.Ct. at 2831 (Stevens, J., concurring):
   I agree that the First Amendment protects the public and the press from abridgement of their rights of access to information about the operation of their government, including the Judicial Branch; given the total absence of any record justification for the closure order entered in this case, that order violated the First Amendment.

8. "Open trials play a fundamental role in furthering the efforts of our judicial system to assure the criminal defendant a fair and accurate adjudication of guilt or innocence." *Id.* at 2837 (citation omitted) (Brennan, J., concurring in judgment).

9. "The crucial prophylactic aspects of the administration of justice cannot function in the

dark; no community catharsis can occur if justice is 'done in a corner [or] in any covert manner.'" *Id.* at 2825 (citation omitted.)

10. A conceptually separate, yet related, question is whether the media should enjoy greater access rights than the general public. But no such contention is at stake here. Since the media's right of access is at least equal to that of the general public, this case is resolved by a decision that the state statute unconstitutionally restricts public access to trials.
   100 S.Ct. at 2832 n.2 (citations omitted) (Brennan, J., concurring in judgment).

11. "Respondents argue that release of the tapes is required by both the First Amendment guarantee of freedom of the press and the Sixth Amendment guarantee of a public trial. Nei-

sented from the opinion of the Court in *Warner Communications,* no voice was raised against this particular constitutional conclusion. Nothing in *Richmond Newspapers* stands to the contrary.[12]

■ Appellant KDFW raises an additional constitutional ground for access to the tapes, one allegedly found in the petition clause [13] of the first amendment:

> The public (and the press' rights are coextensive with that of the public) cannot adequately petition the federal government with respect to the alleged improprieties in establishment or maintenance of the "Brilab" investigation, nor can they effectively petition government with respect to the qualifications of Speaker Clayton without access to these tapes.

Appellant points to no authority suggesting that any treatment extended press or public in the court below has affected the right to petition for redress of grievances. The cited cases, chiefly on inmates' rights of access to legal materials, are inapposite. Appellant's position is simply its "freedom of the press" argument cast in a slightly different mold. There is no doubt that, to whatever extent, if any, the petition clause would enter in here, its values are fully served by the opportunity allowed press and public alike to view the proceedings and the provi-

sion of transcripts of the tapes for republication or broadcast. The government is not required under the first amendment—through the petition clause or otherwise—to provide representatives of the news media with the tapes for copying and rebroadcasting.

### III. *The Common Law Right of Access.*

■ There is a right of access to these courtroom exhibits derived not from the Constitution: a common law right of access "that predates the Constitution itself." *United States v. Mitchell,* 551 F.2d 1252, 1260 (D.C.Cir. 1976), *rev'd sub nom. Nixon v. Warner Communications,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). As with the constitutional claim, the Court's opinion in *Warner Communications* provides the measure by which we review the trial court decision on the right of physical access to these tapes. "It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." 435 U.S. at 597, 98 S.Ct. at 1312 (footnote omitted). While the question was not certainly answered by the Court's opinion in *Warner Communications,*[14] we assume for purposes of this discussion that the right of access extends beyond scroll and paper to tape recordings. Finding no need on the facts of

---

ther supports respondents' conclusion." 435 U.S. at 608, 98 S.Ct. at 1317.

**12.** Opinions in *Richmond Newspapers* recognized the special informative role played by the press in the maintenance of open criminal proceedings, but this status was acknowledged to be born of practical necessity rather than constitutional entitlement.

> Instead of acquiring information about trials by firsthand observation or by word of mouth from those who attended, people now acquire it chiefly through the print and electronic media. In a sense, this validates the media claim of functioning as surrogates for the public. While media representatives enjoy the same right of access as the public, they often are provided special seating and priority of entry so that they may report what people in attendance have seen and heard.

100 S.Ct. at 2825. "As a practical matter, however, the institutional press is the likely, and fitting, chief beneficiary of the right of access because it serves as the 'agent' of inter-

ested citizens, and funnels information about trials to a large number of individuals." *Id.* at 2832–33 n.2 (Brennan, J., concurring in judgment).

**13.** "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I.

**14.** Petitioner also contends that the District Court was totally without discretion to consider release of the tapes at all. He offers three principal arguments in support of that position: . . . (ii) recorded materials, as opposed to written documents, are not subject to release by the court in custody; . . . .

> As we assume for the purposes of this case . . . that the common law right of access is applicable, we do not reach or intimate any view as to the merits of these various contentions by petitioner.

435 U.S. at 599 n.11, 98 S.Ct. at 1313.

the Watergate Tapes case "to delineate precisely the contours of the common-law right," *id.* at 599, 98 S.Ct. at 1313, the Court found it "uncontested" that the right to inspect and copy judicial records is not absolute. *Id.* at 598, 98 S.Ct. at 1312. The question becomes, then, under what circumstances access may be denied, and to whose judgment that decision is substantially committed. The Supreme Court's answer to the second question suggests the impossibility of definitively answering the first: "The few cases that have recognized such a right do agree that the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Id.* at 599, 98 S.Ct. at 1312–13. The District of Columbia Circuit, whose decision was reversed in *Warner Communications,* acknowledged the same answers to the prefatory questions: "Because no clear rules can be articulated as to when judicial records should be closed to the public, the decision to do so necessarily rests within the sound discretion of the courts, subject to appellate review for abuse." *Mitchell,* 551 F.2d at 1260.

■ Before turning to a review of the district judge's exercise of discretion in denying access, we consider briefly the appellants' suggestion that review for abuse of discretion is not our sole function. The broadcasters argue that certain language in *Warner Communications,* quoted in the

margin,[15] indicates an unwillingness on the part of the Court to submit the question substantially to the discretion of the trial judge. While acknowledging the possible ambiguity of that language, we find the entirety of the majority opinion, as well as remarks in the dissents, not supportive of appellants' position. In discussing the existence of this right of access, Justice Powell in his majority opinion recognized as an initial matter that the cases were in agreement "that the decision as to access is one best left to the sound discretion of the trial court . . . ." 435 U.S. at 599, 98 S.Ct. at 1312. In examining the right of access in this particular case, the majority opinion decided that the Presidential Recordings and Materials Preservation Act concluded the issue against access. The Court found that in this instance Congress had withdrawn access to these tapes from any exercise of judicial discretion: the Act was "a *decisive element* in the proper exercise of discretion with respect to release of the tapes." *Id.* at 607, 98 S.Ct. at 1317 (emphasis added). The decision to allow access, however, in the general run of cases would remain in the sound discretion of the district court. While rejecting the majority's conclusion on the statute's determination of the question, Justice Marshall's dissent reflects an acceptance of the principle of limited review.[16] Justice Stevens, viewing the actions of the lower courts and the history of the case differently from the majority,[17]

**15.** "We need not decide how the balance would be struck if the case were resolved only on the basis of the facts and arguments reviewed above." 435 U.S. at 603, 98 S.Ct. at 1315. "At this point, we normally would be faced with the task of weighing the interests advanced by the parties in light of the public interest and the duty of the courts." *Id.* at 602, 98 S.Ct. at 1314.

**16.** The Court "also recognizes that the court with custody of the records must have substantial discretion in making the decision regarding access." *Id.* at 613, 98 S.Ct. at 1320 (Marshall, J., dissenting).

**17.** The somewhat confused characterization of what the Court was actually doing in this case stems from the bifurcated nature of the decision below on access: two district judges, in two orders, separately addressed the issue. At

the time of the initial request, the judge presiding at the criminal trial (Judge Sirica) in which the tapes were introduced was quite occupied with that trial; the request was then favorably acted on by another judge (Judge Gesell) in that district to whom the matter had been transferred. Subsequent to his decision that access should be allowed, Judge Gesell transferred the matter back to Judge Sirica, now freed of duties in the recently concluded criminal trial. Judge Sirica decided that granting access to the tapes was inadvisable at the time, due largely to the possible interference with the rights of defendants in the event of retrial after appeal. Justices Marshall and Stevens indicate in their dissents that the trial judge whose discretion they were reviewing was Judge Gesell.

vigorously dissented from what he perceived as the majority's reversal of the court of appeals' affirmance of a district court decision to allow access to the tapes: "The question whether a trial judge has properly exercised his discretion in releasing copies of trial exhibits arises infrequently. It is essentially a question to be answered by reference to the circumstances of a particular case. Only an egregious abuse of discretion should merit reversal." *Id.* at 613–14, 98 S.Ct. at 1320. We take our lesson, then, as we must, from the Supreme Court and review the district court decision for abuse of discretion.[18]

▆ In denying the broadcasters' request for physical access to the Brilab tapes, the district judge did not abuse his discretion. The judge's concern was with the rights of a yet-to-be tried defendant; the provision to a defendant of a fair trial is a reasonable and necessary concern of the presiding judge. The substantially postponed trial of L. G. Moore, while the indictment remains outstanding, is not of a "hypothetical" nature.[19] The broadcasters argue to this court that the trial judge exaggerated the risks to a fair trial posed by public broadcast of the tapes; as "evidence," they point to facts about what they perceived as a smooth and effortless empaneling of a jury in the criminal trial of the other defendants (two days; seven jurors stricken for cause). This argument fails for several related reasons.

The broadcasters' argument that the concern for defendant Moore's fair trial rights was exaggerated beyond proper proportion is addressed to an audience in perhaps the worst possible position to make that judgment: appellate courts are far removed in time and space from the events in the course of criminal trials. And while distance may allow us to escape the smoke and heat generated in those proceedings, our distance from the flame robs us as well of the light cast thereby.

▆ In urging reversal of the district court's determination that Moore's rights would be compromised by access to the tapes, the appellants would have us say that the trial court must have positive proof of the impossibility of assuring defendant a fair trial before access may be denied. A forecast of future difficulty is by definition uncertain, but equally uncertain is the rejection of that forecast. Speculative dismissal by an appellate court of a trial judge's admittedly uncertain but quite reasonable prognostication only compounds the problem. The informed and considered judgment of the trial judge should prevail in any choice between such equally speculative results. It is better to err, if err we must, on the side of generosity in the protection of a defendant's right to a fair trial before an impartial jury.

18. In rejecting the broadcasters' contention that our target on review is other than abuse of discretion, we acknowledge that a recent opinion from another circuit has found proper review under these circumstances to be more exacting than that here applied. The Third Circuit in *In re Application of National Broadcasting Co. (United States v. Criden)*, 648 F.2d 814 (3d Cir. 1981), after an extended analysis of the appropriate standard of review, substantially based on Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above*, 22 Syracuse L.Rev. 635 (1971), found that proper appellate review in these circumstances required appellate reconsideration of "the relevance and weight of the factors," 648 F.2d at 818, considered by the trial judge. The court found that a decision on release of tapes "is not accorded the narrow review reserved for discretionary decisions based on first hand observations" of the trial judge. *Id.* We have considered this analysis presented by the Third

Circuit but are unable to follow it beyond its foundation—that the decision to grant or deny access to tapes during the course of a criminal prosecution is not based on "first hand observations" of the presiding trial judge. When the concern is the efficient administration of justice and the provision to defendants of fair trials, the consideration of competing values is one heavily reliant on the observations and insights of the presiding judge.

19. "We thus adhere to our holding in *Mitchell* that the interest in avoiding the risk of potential prejudice at a *hypothetical* second trial is seldom of sufficient weight to justify denying access to judicial records which have been displayed in open court." *In re Application of National Broadcasting Co. (United States v. Jenrette)*, 653 F.2d 609 (D.C.Cir. 1981) (emphasis in original).

■ Finally, in pointing to events surrounding the allegedly easy selection of a jury for the earlier trial as indicative of the unlikelihood that pretrial publicity would affect the rights of the untried defendant, the appellants disregard the effect that media access to and rebroadcast of the tapes could have. General pretrial publicity and any attendant prejudice to a defendant's rights before disclosure and rebroadcast of the tapes would not necessarily be the same as what may obtain in a second trial following public broadcast. That prior to broadcast of the tapes pretrial publicity had not unduly infringed the fair trial rights of particular defendants does not answer the inquiry presented to the district judge here.

■ Appellants further argue that the trial judge abused his discretion in denying them access because a number of procedural devices were otherwise available to quarantee the defendant's fair trial rights: searching *voir dire* examination of potential jurors; empaneling of a larger body of veniremen; and change of venue, among others. Accepting this argument would require us to direct the trial judge in the practical management and operation of his courtroom, a course we are loath to take in any but the most extreme circumstances. We cannot assume trial court ignorance of these familiar devices, and we will not assume inattention to their availability. Second, on this inquiry we remain in a poor position from which to second guess the trial judge on the relative costs and benefits to the efficient administration of justice of such protective measures. Finally, the Supreme Court's preference for such devices over the closure of the flow of information about criminal trials, expressed in cases like *Nebraska Free Press Association v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1975),[20] came in the context of government infringement of first amendment rights—in *Stuart*, for example, a gag order imposed by the state trial judge prohibiting publication of certain statements of the accused and of information strongly implicating him in the commission of the crimes. But as the Supreme Court has held and as we repeat, access to court records and exhibits for copying and rebroadcasting is not a matter of constitutional right. That the balance is heavily weighted in favor of protective measures other than absolute closure of the trial to press or public, or of prior restraints on publication of information, does not mean that the same balance prevails when less compelling rights are asserted by the press. As Justice Black observed in *Bridges v. California*, 314 U.S. 252, 260, 62 S.Ct. 190, 192, 86 L.Ed. 192 (1941), "free speech and fair trials are two of the most cherished policies of our civilization, and it would be a trying task to choose between them." That "issue . . . of the very greatest moment," *id.*, is not before us. The common law right of access certainly antedates the Constitution's free press guarantee, but it does not rise to that level of importance or merit the same degree of protection. The first amendment rights of the broadcasters, as noted above, were fully satisfied here. No restrictions on the ability of the news media to receive and transmit information were imposed. The district court was not at all required to balance "fair trial" with "free press" concerns. The "choice" was rather between an undeniably important but nonconstitutional right of physical access to courtroom exhibits and a defendant's due process right to a fair trial, "the linchpin of our criminal justice system." *In re Application of National Broadcasting Co. (United States v. Criden)*, 648 F.2d at 827. While the provision to media representatives of verbatim transcripts of the recordings and preferential seating at the trial, as afforded in the court below, certainly does not conclude the matter against a right to further access, it has been recognized by the Supreme Court as a factor properly to be considered in the grant or denial of physical access.[21]

**20.** "We cannot say on this record that alternatives to a prior restraint on petitioners would not have sufficiently mitigated the adverse effects of pretrial publicity so as to make prior restraint unnecessary." 427 U.S. at 569, 96 S. Ct. at 2807.

**21.** Petitioner further argues that this is not a "right of access" case, for the District Court

In reaching our conclusion that the district judge did not abuse his discretion in denying the appellants' request for access to the taped evidence, we have considered carefully, along with *Warner Communications*, the lodestar from the Supreme Court, three recent cases from other circuits deciding this same question of access in the context of another FBI operation. *In re Application of National Broadcasting Co. (United States v. Myers)*, 635 F.2d 945 (2d Cir. 1980); *In re Application of National Broadcasting Co. (United States v. Criden)*, 648 F.2d 814 (3d Cir. 1981); and *In re Application of National Broadcasting Co. (United States v. Jenrette)*, 653 F.2d 609 (D.C.Cir. 1981).[22] We have previously mentioned where we part company with the Third Circuit in *United States v. Criden, see* note 18, *supra*, and will not here repeat those reservations. Our attention here is directed to the remaining cases, *Myers* and *Jenrette*, one of which (*Jenrette*) reviews for abuse of discretion[23] and finds it, the other of which (*Myers*), in affirming the decision of the district court to allow access, leaves as an open question whether abuse of discretion is the sole appellate inquiry.[24]

Our fundamental difference with both these cases[25] lies in their holdings that "only the most compelling circumstances" should prevent access to these tapes[26] and that the party opposing access must demonstrate that "justice so requires,"[27] and the correlative finding that the potential risks to defendants' fair trial rights in these circumstances could not prevail against the strong, indeed overwhelming, presumption in favor of access.[28] In our judgment, the opinion in *Nixon v. Warner Communica-*

---

already has permitted considerable public access to the taped conversations through the trial itself and through publication of the printed transcripts. We need not decide whether such facts ever could be decisive. In view of our disposition of this case, the fact that substantial access already has been accorded the press and the public is simply one factor to be weighed. 435 U.S. at 599 n.11, 98 S.Ct. at 1313.

**22.** Subsequent references to these cases will be to the style of the underlying criminal case, rather than to the ubiquitous *In re Application of National Broadcasting Co.*

**23.** Because of the difficulties inherent in formulating a broad yet clear rule to govern the variety of situations in which the right of access must be reconciled with legitimate countervailing public or private interests, the decision as to access is one which rests in the sound discretion of the trial court. Any denial or infringement of this "precious" and "fundamental" common law right remains subject to appellate review for abuse. *United States v. Jenrette*, 653 F.2d at 613 (quoting *United States v. Mitchell*, 551 F.2d at 1260, 1261.

**24.** *Warner Communications* does not clarify whether, in the absence of statute, the decision to release the tapes would have been left to the trial court, reviewable only for traditional abuse of discretion, or whether reviewing courts would themselves assess the competing interests. While the opinion refers to the need for the trial court to exercise an informed discretion, the court also says that in the absence of a statute "we" would be faced with the task of weighing the competing interests. *United States v. Myers*, 635 F.2d at 950 n.3.

**25.** In the third case, *United States v. Criden*, the Third Circuit in its de novo reweighing of the competing values, found the "strong common law presumption of access" to countervail the fair trial right of defendant, thought sufficiently defensible by less drastic measures than denial of access. If the courts' approaches in *Myers* and *Jenrette* are misguided, as we suggest, then the *Criden* court shares that error.

**26.** "When physical evidence is in a form that permits inspection and copying without any significant risk of impairing the integrity of the evidence or interfering with the orderly conduct of the trial, only the most compelling circumstances should prevent contemporaneous public access to it." *United States v. Myers*, 635 F.2d at 952 (footnote omitted).

**27.** [A]ccess may be denied only if the district court, after considering "the relevant facts and circumstances of the particular case," and after "weighing the interests advanced by the parties in light of the public interest and the duty of the courts," concludes that "justice so requires." *United States v. Jenrette*, 653 F.2d at 613 (citations omitted).

**28.** "We disagree ... that the likelihood of such enhanced awareness of the tapes poses the kind of risk to fair trials for Abscam defendants that justifies curtailing the public's right of access to courtroom evidence." 635 F.2d at 953.

*tions* offers no basis from which one can derive the overpowering presumption in favor of access discovered by the Second and District of Columbia Circuits. The Supreme Court there neither drafted explicit limits nor assigned specific weight to this common law right of access. The Court, rather, acknowledged "the presumption—however gauged—in favor of public access to judicial records," as *one* of the interests to be weighed on the broadcasters' "side of the scales." 435 U.S. at 602, 98 S.Ct. at 1314. It did not find the simple existence of the right conclusive. In elaborating on its observation that this right of access is not absolute, the Court noted several circumstances in which "the common-law right of inspection has bowed before the power of the court to insure that its records" are not used as "vehicle[s] for improper purposes." [29] The Second Circuit acknowledged the Supreme Court's recitation of these circumstances but devalued their significance with the observation that those past circumstances had warranted preventing all public scrutiny of the materials and not the simple copying and rebroadcasting of items already revealed in open court. 635 F.2d at 950. Pretermitting any argument with the logic of that position, we are convinced, by reference to one of the listed circumstances in the Supreme Court's discussion of the competing interests in *Warner Communications*, that these circumstances, among others, were thought appropriate considerations in deciding requests for access to courtroom exhibits.[30]

That the broadcasters seek the tapes for appropriate, and not for "improper," purposes does not diminish the importance of the Court's discussion to our analysis. That good reasons may exist for a trial court, in the exercise of its "supervisory power over its own records and files," 435 U.S. at 598, 98 S.Ct. at 1312, to deny requested access to *courtroom exhibits is our focus.* The Supreme Court has not directed lower courts to measure requests for access to evidence only against the "most compelling circumstances." Rather, we read the Court's pronouncements as recognizing that a number of factors may militate against public access. In erecting such stout barriers against those opposing access and in limiting the exercise of the trial court's discretion, our fellow circuits have created standards more appropriate for protection of constitutional than of common law rights. With all due respect, we find such standards to be misreadings of the Supreme Court's directives, and we decline to apply them here. In his decision to deny the broadcasters' request for access to the audiotapes, the district court did not abuse its discretion. The judgments below are

AFFIRMED.

---

**29.** For example, the common-law right of inspection has bowed before the power of the court to insure that its records are not "used to gratify private spite or promote public scandal" through the publication of "the painful and sometimes disgusting details of a divorce case." ... [C]ourts have refused to permit their files to serve as reservoirs of libelous statements for press consumption ... or as sources of business information that might harm a litigant's competitive standing ....
*Id.* at 598, 98 S.Ct. at 1312.

**30.** The court—as custodian of tapes obtained by subpoena over the opposition of a sitting President, solely to satisfy "fundamental demands of due process of law in the fair administration of criminal justice" ... has a responsibility to exercise an informed discretion as to release of the tapes, with a sensitive appreciation of the circumstances that led to their production. This responsibility does not permit copying upon demand. Otherwise, there would exist a danger that the court could become a partner in the use of the subpoenaed material "to gratify private spite or promote public scandal," ... with no corresponding assurance of public benefit.
435 U.S. at 603, 98 S.Ct. at 1314–15 (citations omitted).