**UNITED STATES of America, Plaintiff,**

v.

**Victor POSNER and William Scharrer, Defendants.**

**No. 82–352–Cr.**

United States District Court, S.D. Florida, Miami Division.

Sept. 19, 1984.

See also, D.C., 594 F.Supp. 916, D.C., 594 F.Supp. 923.

Parker Thomson, Laura Besvinick, Miami, Fla., for Miami Herald.

Edward Bennett Williams, Richard M. Cooper, Mary G. Clark, Washington, D.C., for Victor Posner.

## MEMORANDUM OPINION AND ORDER DENYING POSNER'S MOTION FOR A PROTECTIVE ORDER

SPELLMAN, District Judge.

At the conclusion of William Scharrer's trial in the above-captioned case, the Miami Herald requested that this Court provide for its inspection and copying the individual tax returns of Victor Posner that had been received into evidence at the trial. The Miami News then joined in this request. The Court notified Posner's attorney and gave him an opportunity to file appropriate pleadings if he had any objections to affording the press access to the returns.

On August 17, 1984, Posner filed a motion for a protective order in which he urged this Court to deny the newspaper's request to inspect and copy his tax returns, on the ground that his constitutionally guaranteed rights to privacy and to a fair trial, as well as the clear statutory policy to protect the confidentiality of federal tax returns, outweigh the newspapers' right of

access to courtroom exhibits.[1] The Miami Herald filed an opposition to Posner's motion.[2]

The Court has reviewed the motions and memoranda provided by counsel and heard oral argument in this matter. For the reasons explained more fully below, the Court finds that the press, in this case, has a First Amendment right to inspect the tax returns that were placed into evidence and that this right outweighs Posner's asserted interests in non-disclosure.[3]

## BACKGROUND

Victor Posner and William Scharrer were charged in a twelve count indictment with criminal violations of the federal income tax laws. The gist of the offenses against them was that Scharrer wilfully provided Posner with falsely inflated appraisals of land that Posner donated to the Miami Christian College and that Posner wilfully used these falsely inflated appraisals to take improper deductions on his tax returns for the years 1975–1979.[4]

Prior to the trial, the Government's exhibits were premarked and made available to defense counsel. At a status conference before this Court, the Court inquired of defense counsel as to whether there would be any authenticity or relevancy objections to the Government's exhibits. Posner's

counsel indicated that he had no authenticity objections to the tax returns but there may be relevancy objections. However, no specific objections to the returns were ever articulated.

The case proceeded to trial on July 26, 1984. On August 1, 1984, a separate trial was granted to Posner on his motion for severance. It was after this severance that Posner's tax returns were introduced into evidence against Scharrer. There was no objection to the introduction of the returns into evidence and no motion to place the returns under seal. Although Posner was not a party to the trial at the time the returns were offered into evidence, Posner's attorneys were observing the Scharrer trial and were present when the returns were offered. At the completion of the trial, the entire returns were submitted to the jury and presumably were used in its deliberations. On August 10, 1984, Scharrer was found guilty on all counts. Posner is still awaiting trial.

## THE PRESS' RIGHT OF ACCESS TO EXHIBITS IN A CRIMINAL TRIAL

Posner claims that neither the public nor the press enjoys any constitutional right of access to exhibits in a criminal trial and that only a bare common law presumption

1. Posner has no objection to the Court releasing a version of his returns redacted to exclude all items and information other than that actually testified to during the trial.

2. The Miami News did not file a separate memorandum, but joined in the pleadings filed by the Miami Herald.

3. Although the Court finds that the press has a First Amendment right to inspect and copy the returns, the same result would obtain under the common law right of access to judicial records. Because the Court finds that Posner's right to a fair trial is not in jeopardy by the disclosure of the returns, and any entitlement of privacy Posner may have had was relinquished when the returns were actually placed in evidence, the presumption of access would nonetheless require this Court to permit the press to inspect and copy the returns.

4. The indictment charged the defendants as follows: Count I charged Posner and Scharrer with conspiracy under 18 U.S.C. § 371; Count II charged Posner with tax evasion for 1976 under

26 U.S.C. § 7201; Count III charged Posner with tax evasion for 1977 under 26 U.S.C. § 7201; Count IV charged Posner and Scharrer with tax evasion and aiding and abetting tax evasion respectively, for 1978 under 26 U.S.C. § 7201 and 18 U.S.C. § 2; Count V charged Posner with tax evasion for 1979 under 26 U.S.C. § 7201; Counts VI–X charged Posner with filing false tax returns for 1975 through 1979, respectively, under 26 U.S.C. § 7206(1); Counts XI–XII charged Scharrer with aiding the filing of false tax returns for 1975 and 1978 under 26 U.S.C. § 7206(2).

The multiple counts originate in the manner in which the charitable deduction was taken. The tax code permits a large deduction to be spread over several years. Posner made his first donation of land in 1975. He deducted that gift on his 1975, 1976, and 1977 tax returns. The second gift was made in 1978. The deduction for that gift was taken in 1978 and 1979. Scharrer acted as an appraiser with respect to both gifts.

supports the newspapers' right of access to courtroom exhibits. He relies on two cases for this pronouncement: *Nixon v. Warner Communications Inc.,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) and *Belo Broadcasting v. Clark,* 654 F.2d 423, 427 (5th Cir. Unit A 1981).

The Court finds that Posner's reliance on these cases is misplaced for two reasons. *First,* in both *Nixon* and *Belo,* the Court only held that the media had no special right to make aural copies of tapes placed in evidence at a criminal trial when the press already was provided with transcripts of the tapes at issue. There was no question in those cases, as there is here, of restrictions on press access to, or publication of any *information* concerning material placed into evidence during a criminal trial. *Second,* cases decided subsequent to *Nixon* and *Belo* have recognized a First Amendment right of access to all judicial records absent a compelling interest, narrowly drawn supporting closure.

### A. *Nixon* and *Belo* Do Not Hold That There Is No First Amendment Right of Access to Court Exhibits

In *Nixon,* various electronic media claimed a constitutional and common law right to make aural copies of President Nixon's White House tapes which were introduced into evidence at the Watergate trials. The Supreme Court, by a 5–4 vote, rejected this claim and found that the press has no special right to make aural copies of tapes for rebroadcast and sale to the public. But in so holding, the Court clearly explained that the press had already been permitted to listen to the tapes and had been provided with complete transcripts of the tapes. 435 U.S. at 594, 98 S.Ct. at 1310. Indeed, a close analysis of the Court's opinion demonstrates that *Nixon* cannot be read to hold that the press does not enjoy the right to inspect matters that have been placed in evidence during a criminal trial.

In his motion for a protective order, former President Nixon presented four grounds for the denial of the press' request for access to the tapes. These grounds included a claimed property interest in his own voice; an asserted right to privacy in the tape's contents; and a limited Executive Privilege in the tapes. *Id.* at 600–02, 98 S.Ct. at 1313–14.

The Supreme Court observed that in adjudicating a common law right for access to court exhibits it would normally be required to balance Nixon's interests against those favoring public access. *Id.* at 602, 98 S.Ct. at 1314. However, the Court found that it need not engage in any balancing because Congress had displaced the common law right to copy such records by passing the Presidential Recordings Act. The Court explained that the Act "created an administrative procedure for processing and releasing to the public, on terms meeting with congressional approval, all of petitioner's Presidential materials of historical interest, including recordings of the conversations at issue here." *Id.* at 603, 98 S.Ct. at 1315. There was no need to balance the competing interests at stake because Congress already had provided the "appropriate means of assuring public access to the material." *Id.* at 604, 98 S.Ct. at 1315.

Thus, the Court found that it "need not weigh the parties competing arguments as though the District Court were the only potential source of information regarding these historical materials. The presence of an alternative means of public access tips the scales in favor of denying release." *Id.* at 606, 98 S.Ct. at 1316.

The Court analyzed the electronic media's First Amendment claim for physical access to the tapes in a similar manner. The Court found that there had been no infringement of the First Amendment because

there simply were no restrictions upon press access to, or publication of, any information in the public domain. Indeed, the press—including reporters of the electronic media—was permitted to listen to tapes and report on what was heard. Reporters also were furnished transcripts of the tapes, which they were free to comment upon and publish. The

contents of the tapes were given wide publicity by all elements of the media. *Id.* at 609, 98 S.Ct. at 1318. The Court flatly stated that "[t]here is no question of truncated flow of information to the public." *Id.* Accordingly, the Court found that "the issue presented in this case is not whether the press must be permitted access to public information to which the public is generally guaranteed access, but whether these copies of the White House tapes—to which the public has never had *physical* access—must be made available for copying." *Id.* at 609, 98 S.Ct. at 1318.

In sum, the Court in *Nixon* simply held that the electronic media did not enjoy any special right to gain physical access to tapes admitted into evidence, in addition to the written transcripts, so as to make aural copies of the tapes for rebroadcast.

In *Belo,* the Court of Appeals for the Fifth Circuit was presented with an almost identical situation. The Court found that denying access to the press did not violate any First Amendment right because, as in *Nixon v. Warner Communications,* there were " 'no restrictions on press access to, or publication of any information in the public domain.' Members of the press were allowed to listen as the tapes were played in court; transcripts were prepared and distributed for their use; reporters and broadcasters were free to report this information as they wished." *Belo,* 654 F.2d at 427 (citation omitted). The Court summarized that: "All that was denied [the media] was the right to play these tapes over the air waves; that the Constitution does not require." *Id.*

In contrast, Posner's tax returns were placed in evidence and were available in their *entirety* to be used by the jury in its deliberations in the Scharrer trial. Although there was some testimony during the trial as to certain matters contained in the returns, the press and the public have not had access to the information contained in the returns that were not testified to. The press here is not requesting special permission to make aural copies of anything, and it has not been provided with an alternative way to gain the information that was submitted to the jury. Both *Nixon* and *Belo* are therefore inapposite.

## B. Recent Cases Support the View That, Absent a Compelling Interest Necessitating Closure, There is a First Amendment Right to at Least Inspect Exhibits Admitted into Evidence In a Criminal Trial

In recent years, the Supreme Court has clearly recognized that the First Amendment guarantees that the public has a right to access to criminal trials. *See Press-Enterprise v. Superior Court,* —— U.S. ——, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984); *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980).

As the Court explained in *Globe Newspaper,* this right rests in part on the fact that "the criminal trial historically has been open to the press and the general public" and in part on the fact that "public access to criminal trials permits the public to participate in and serve as a check upon the judicial process—an essential component of self-government." 457 U.S. at 605–06, 102 S.Ct. at 2619–20. The Court noted that even though the right of access to criminal trials is of "constitutional stature," the right is not absolute. *Id.* However, "[w]here ... the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Id.* at 606–07, 102 S.Ct. at 2620.

In the Supreme Court's most recent case in this area, *Press-Enterprise,* the press sought access to the transcript of a voir dire proceeding even though the proceeding itself had been closed to the public. The issue before the Court was whether the First Amendment granted the right of access to the transcript. All nine justices concurred that the press had a First Amendment right of access to the tran-

script of the voir dire proceedings. Chief Justice Warren Burger, writing for the Court, stated: "The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether closure was properly entered." 104 S.Ct. at 824.

Although the Supreme Court has not dealt squarely with the issue of whether the public and the press have a First Amendment right of access to inspect documents placed into evidence at a criminal trial, this Court is of the opinion that the right of access extends to examining exhibits admitted into evidence. Indeed, other courts have found that there is a First Amendment right of access to documents placed in evidence or filed with the court. *See, e.g., In the Matter of Continental Securities Litigation,* 732 F.2d 1302 (7th Cir.1984) (First Amendment right of access to special litigation report introduced into evidence); *In re Globe Newspaper,* 729 F.2d 47 (1st Cir.1984) (First Amendment right of access to memorandum, affidavits and transcripts relating to pre-trial bail hearing, but is outweighed by the rights of defendant under the facts of that case); *Associated Press v. District Court,* 705 F.2d 1143 (9th Cir.1983) (First Amendment right of access to pretrial documents).[5]

Nor is there reason to distinguish between those portions of the tax returns that were testified to at the trial and those that were only offered into evidence. Once the returns were admitted into evidence, they became part of the public record and entered the public domain. *See United States v. Carpentier,* 526 F.Supp. 292, 295 (E.D.N.Y.1981) ("the distinction ... that the tapes were not played at the hearing ... is not dispositive in light of the fact that, by the admission of the tapes into

evidence without seal, they became part of the public record").

Accordingly, this Court finds that the press has a First Amendment right of access to the tax returns that were admitted into evidence at Scharrer's trial and this right of access can only be overcome by a compelling interest, narrowly drawn. The interests Posner has asserted against disclosure must be examined against this standard.

## POSNER'S INTERESTS IN NON-DISCLOSURE

Posner has asserted several interests supporting closure. But singly or together these interests cannot outweigh the press' right to inspect and copy the returns.

█ Posner first argues that public disclosure of his tax returns would violate his constitutional right to privacy, one of the strands of which is the "individual interest in avoiding disclosure of personal matters...." *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977). Posner also points to the opinion of the Court of Appeals for the Fifth Circuit in *Plante v. Gonzalez,* 575 F.2d 1119 (5th Cir.1978), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979), where the Court found that the privacy of personal financial information falls directly within the scope of this "right to confidentiality." *Id.* at 1132.

This constitutional claim to financial privacy is claimed to be buttressed by the clear statutory policy to protect the confidentiality of federal tax returns, reflected in the disclosure provisions of the Tax Reform Act of 1976, Pub.L. No. 94–455, which amended Section 6103 of the Internal Revenue Code to provide, in part, that "[r]eturns and return information shall be confidential...." The amended Act made unauthorized disclosure of tax return information a felony. 26 U.S.C. § 6103(a) (West

---

5. In *Newman v. Graddick,* 696 F.2d 796, 802 (11th Cir.1983), the Eleventh Circuit, citing *Nixon,* indicated that there may not be a right to copy documents that are part of court proceedings. The Court did not decide the issue, how-

ever, because it found that even under the common law right of access the press was entitled to inspect and copy the documents at issue in that case. *Id.* at 803–04.

Supp.1984). The new amendments also imposed certain restrictions on the use of third-party returns at pretrial and trial stages of tax cases.

Specifically, the return information of a third party may be disclosed in a tax proceeding only if, and to the extent that, the treatment of an item reflected on his return is or may be relevant to the resolution of the civil or criminal tax liability at issue in the proceeding, or the return information relates to a transaction between the third party and the party whose liability is at issue. 26 U.S.C. § 6103(h)(4) (West Supp. 1984). Relying upon these provisions, Posner claims that he is entitled to protection against public disclosure of those personal financial matters reflected in his tax returns "that have not already been revealed in the course of Scharrer's trial."

The most obvious problem with Posner's argument is that all of the returns at issue here have "already been revealed in the course of Scharrer's trial." While it is true that only certain portions were testified to, the returns in their entirety were admitted into evidence and provided to the jury for its consideration during its deliberations.

■ Posner now claims that only those portions of the returns pertaining to the donation of parcels of land and the specific charitable deductions claimed in connection therewith and the items reporting gross and taxable income for each of the years in question were actually relevant in the Scharrer trial. This argument comes too late. The fact is that the returns were admitted into evidence in their entirety and considered by the jury in determining whether Scharrer was guilty of the crimes charged in the indictment.

In *Cox Broadcasting v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), the Supreme Court held that no cognizable privacy interest was compromised by the publication of the name of a rape victim, when the name of the victim had already been placed in the court file. The Court stated that "even the prevailing law of invasion of privacy generally recognizes that the interests in privacy fade when the information involved already appears on the public record. The conclusion is compelling when viewed in terms of the First and Fourteenth Amendments and in light of the public interest in a vigorous press." *Id.* at 494–95, 95 S.Ct. at 1046. The Court explained that when information is placed in a court record it is within the public domain:

> By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served. Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the conduct of public business.

*Id.* at 495, 95 S.Ct. at 1046.

Thus, once certain information is in the public domain, as it is here, the entitlement to privacy is lost. This is the case even when the information in question is part of a federal income tax return. *Cooper v. Internal Revenue Service*, 450 F.Supp. 752 (D.D.C.1977) (holding that tax returns and tax return information cannot regain their confidential status once the returns have become part of the public record by their use in a public trial).

■ Not only is there no right of privacy for information that has already been placed in a public court file, Posner's asserted right of financial privacy is probably insufficient to support the closure of trial proceedings and records. In *Press-Enterprise*, the Court found that the jurors' right to privacy was insufficient to close voir dire proceedings and in *Globe Newspaper*, the Court held that minor victims of sex crimes' right to privacy insufficient to close trial testimony.

■ Finally, Posner claims that disclosure of his tax returns to the press at this

time would jeopardize his right to receive a fair trial. Posner argues that publication of the information concerning his financial affairs that is contained in his tax returns would likely "fan[ ] the flames of media interest and invit[e] [even more] pervasive publicity." *United States v. Mouzin*, 559 F.Supp. 463, 467 (C.D.Cal.1983). He points out that even if the publicity surrounding the original trial did not preclude a fair trial of Scharrer before an impartial jury, additional pretrial publicity of the sort likely to result from granting the press access to Posner's tax returns at this point may have that result in his upcoming trial.

This Court will assume that release of the tax returns will most likely result in articles concerning Posner's financial affairs. But Posner, as one of the wealthier men in America today, is already in the public eye. He is "news" every time that he makes a tender offer to buy out a company. He is "news" because he is charged with tax fraud. There will be publicity about Posner whether or not this Court releases Posner's tax returns for inspection. Posner has not identified *any* prejudicial information that has not already been published, which would prejudice his right to a fair trial.[6] Indeed, Posner's attorney, during oral argument on his motion for a protective order, specifically stated that those portions of the tax returns that Posner does not want to release have no bearing on the charges in the indictment and are irrelevant to the upcoming trial. In the absence of any suggestion as to how these returns could prejudice Posner's trial, the First Amendment right of the press to inspect the evidence presented in a criminal trial clearly requires this Court to deny Posner's motion for a protective order.

**CONCLUSION**

In the absence of any particularized showing of prejudice, this Court is committed to protect the constitutional rights vested by the First Amendment which ensure that the public can participate in and serve as a check upon the judicial process. If and when a showing is made that Posner's right to a fair trial has been abridged or endangered, this Court will just as vigorously protect that interest.

Accordingly, for the foregoing reasons, the Court denies Posner's motion for a protective order.

In keeping with this Court's previous announcement at oral argument, the effect of this Order is stayed for a period of thirty (30) days to allow Posner to seek whatever appellate relief is available in the Eleventh Circuit.

---

**6.** Shortly before this opinion was issued, the Court issued an opinion in the Posner case in which it ruled that certain evidence would not be admissible against Posner at trial. The Government has previously indicated, in open court, that if the Court ruled adversely to the Government on this issue, it would seek appellate review in the Eleventh Circuit. Since an appeal by the Government will necessarily postpone the trial, the possibility that Posner's right to a fair trial will be jeopardized by publicity surrounding the release of the tax returns at this time is even further reduced.