**UNITED STATES of America**

v.

**A. Reginald EAVES.**

**Cr. No. CR87–406.**

United States District Court,
N.D. Georgia,
Atlanta Division.

April 15, 1988.

William Gaffney, William McKinnon, Asst. U.S. Attys., Atlanta, Ga., for plaintiff.

Jack Goger, Charles Floyd, David Walbert, Atlanta, Ga., for defendant.

Terrence B. Adamson, Peter C. Canfield, James A. Demetry, Dow, Lohnes & Albertson, Atlanta, Ga., for WSB–TV.

**ORDER**

ORINDA D. EVANS, District Judge.

This criminal case is before the court on motion by several television and radio stations in the Metropolitan Atlanta area who seek access to copies of any videotapes and audiotapes [1] which are admitted into evidence during this trial.

The Defendant, A. Reginald Eaves, is charged with receiving money in violation of the Hobbs Act. The indictment arose as a result of a "sting" operation during which the FBI made video and audiotapes of Eaves allegedly accepting bribes from undercover FBI operatives. It is anticipated that a large number of these video and audiotapes will be admitted into evidence at trial. Several local television and radio stations have requested access to the admitted portions of these tapes, presumably to copy and rebroadcast them on television and radio.

Binding precedent in this Circuit holds that there is no absolute First Amendment right to inspect judicial records. *Belo v. Clark,* 654 F.2d 423 (5th Cir. Unit A 1981).[2]

---

1. All of the videotapes include a sound component. Basically videotapes were made of meetings when money was to change hands. Sound recordings only, *i.e.,* audiotapes, were made of other meetings. The bulk of the tapes are audiotapes rather than videotapes. Both audiotapes and the sound portion of the videotapes have been reduced to written transcripts. The press' access to the transcripts, once they are admitted into evidence, has been allowed by verbal ruling on April 14, 1988.

2. All former Fifth Circuit cases, including Unit A cases, decided prior to October 1, 1981 are binding precedent in the Eleventh Circuit. *Stein v. Reynolds Sec., Inc.,* 667 F.2d 33 (11th Cir.1982). *Belo* was decided in August of 1981.

Instead, the media's access to such materials rests on a common-law right to inspect and copy judicial records. The Eleventh Circuit has held,

> The right to inspect and copy records is not absolute, however. [citations omitted]. As with any other form of access, it may interfere with the administration of justice and hence may have to be curtailed. *See Belo Broadcasting Corp. v. Clark,* 654 F.2d 423 (5th Cir.1981) (affirming denial of access to audiotapes admitted into evidence out of concern with a yet-to-be-tried defendant's right to a fair trial). The historic presumption of access to judicial records must be considered in the balance of competing interests. *Id.,* at 434.

*Newman v. Graddick,* 696 F.2d 796, 803 (11th Cir.1983). The initial determination of how these competing factors ought to be evaluated is left to the discretion of the district court. *Id.*

In *Newman,* the Eleventh Circuit laid out the factors which a district court should consider when balancing the common-law right of access against important competing interests. First, district courts should look to whether the records are sought for illegitimate purposes, such as to promote scandal or to gain an unfair commercial advantage. Second, the court must determine whether access is likely to promote public understanding of a historically significant event. Third, the court must determine whether the press has already been permitted substantial access to the contents of the records. In addition, the court may also consider whether administrative difficulties in providing access would disrupt the progress of the trial. Finally, the ability of the defendant to get a fair trial if access is granted is the "primary ultimate value to be weighed on the non-access side of the balance." *Newman,* 696 F.2d at 796; *United States v. Rosenthal,* 763 F.2d 1291, 1294 n. 5 (11th Cir. 1985).

In this case, the court finds that access to the video and audiotapes is not sought for illegitimate purposes, and that public dissemination of the tapes is likely to promote public understanding of a "historically significant event," at least in terms of local politics. Further, the court finds that the press has already been given substantial access to the context of the tapes. There are reporters in the courtroom making notes of the proceedings, and the transcripts of admitted recordings will be released to the media once the tapes are admitted into evidence. The court further finds that the administrative difficulties in providing access to the tapes are not insurmountable. Thus, the only factor weighing against release of the tapes is the effect that widespread dissemination of the tapes may have on Defendant's right to a fair trial.

Most cases regarding media access to video and audiotapes of this nature have discussed the potential impact that release of such tapes could have on the defendant's ability to choose an impartial jury from a community exposed to news broadcasts of the government's case-in-chief. *See, e.g., United States v. Criden,* 648 F.2d 814 (3rd Cir.1981); *In re National Broadcasting Co., Inc.,* 653 F.2d 609 (D.C.Cir.1981). In this case the jury has already been selected. Thus, Defendant is not arguing that media dissemination of the tapes themselves would inhibit his ability to chose an impartial jury; rather, he argues that dissemination of the tapes at this point in the proceedings could unfairly galvanize hostility towards him. He argues that the tapes depict, both visually and through vocal nuances, an artificial relationship with undercover operatives that portrays Mr. Eaves in an unfairly negative light. He contends that release of the tapes as they are introduced by the government, before Defendant has had a chance to present his evidence regarding the context of the taped conversations, could provoke attempts to tamper with the jury, which is already in the process of hearing the case. Defendant contends that the "live" tapes would be more provocative than the transcripts alone, and hence more likely to engender interference with the trial.[3] The govern-

---

3. The Defendant also objected to release of the transcripts.

ment agrees with Defendant's position on this issue.

Although Defendant is discussing a hypothetical situation, jury tampering does occur, and remains a real possibility in any high-profile, controversial case. *See e.g., United States v. Pennell,* 737 F.2d 521 (6th Cir.1984) (five jurors received anonymous telephone calls at home urging them to find defendant guilty, "or else."); *United States v. Williams,* 737 F.2d 594 (7th Cir. 1984) (five jurors contacted at home during criminal trial). Defendant's concern about such attempts is strengthened by the fact that this case has already received substantial publicity. Defendant has, according to counsel's representations to the court, already received "hate mail" and other hostile contacts.

The court is aware that it is difficult to determine whether release of the tapes would have a substantially greater inflammatory impact on the viewing public than release of the transcripts alone. The court is also aware that it is being asked to evaluate a hypothetical possibility of jury tampering. However, it must evaluate these factors in light of the admonition that, "It is better to err, if err we must, on the side of generosity in the protection of a defendant's right to a fair trial before an impartial jury." *Belo,* 654 F.2d at 431.

Having considered all of the relevant factors, the court has determined that portions of the tapes which are admitted into evidence at trial will be released to the media. However, they will not be released until the close of the evidence. To the degree that release of the tapes could provoke an unfair negative reaction, such reaction may be tempered by allowing Defendant a chance to present his case in court before having the tapes exposed to the public. In this way a person watching or hearing the tapes would hopefully evaluate them in light of all the evidence produced at trial. Further, release of the tapes at the close of the evidence will diminish the not insubstantial administrative difficulties involved in providing a copy of the admitted portions of the tapes to the media. Finally, the court strongly disagrees with the movants' suggestion that a delay in access is "tantamount ... to denying such access altogether." The public's right of access to judicial material is not necessarily a right to instantaneous access; nor does the media's right to inspect such materials include a guarantee that they will be released when the effect of their dissemination would be the most sensational. The court is not imposing a substantial delay. At least one court has noted that the inherently controversial nature of these types of tapes generates public interest in viewing them even when they are not released until after conclusion of the trial. *See Application of National Broadcasting Co., Inc.* 635 F.2d 945, 949 (2nd Cir.1980).

Accordingly, the motion to allow access to the portions of the audio and videotapes actually admitted into evidence in this case is GRANTED IN PART and DENIED IN PART.