N.H. NEWMAN, et al.,
Plaintiffs-Appellees,

v.

Charles GRADDICK, Attorney General,
etc., et al., Defendants-Appellees,

The Advertiser Company,
Movant-Appellant.

Gust BIGG, et al., Plaintiffs-Appellees,

v.

Mac Sim BUTLER, etc., et al.,
Defendants-Appellees,

The Advertiser Company,
Movant-Appellant.

No. 81–7886.

United States Court of Appeals,
Eleventh Circuit.

Jan. 5, 1983.

Rushton, Stakley, Johnston & Garrett, Dennis R. Bailey, Montgomery, Ala., for movant-appellant.

Wm. J. Samford, Legal Advisor, M.R. Nachman, Jr., Montgomery, Ala., for Governor James.

Ralph I. Knowles, Jr., Tuscaloosa, Ala., Alvin L. Bronstein, Washington, D.C., Richard D. Shinbaum, Montgomery, Ala., Radney, Radney & Barnes, W. Scears Barnes, Jr., Alexander City, Ala., for Worley James, Nat. Prison Projects, Joe Hopper et al.

Before RONEY and CLARK, Circuit Judges, and TUTTLE, Senior Circuit Judge.

RONEY, Circuit Judge:

The Advertiser Company, the publisher of two Alabama newspapers, appeals the district court's denial of its petitions to copy certain judicial records and to gain access to hearings in this class action concerning unconstitutional overcrowding in Alabama prisons. We reverse.

A general familiarity with the procedural history of this case is necessary to understand our disposition of the jurisdictional and substantive issues. Brought by inmates in Alabama prisons, this class action resulted in injunctive relief followed by a consent decree requiring state officials to reduce the number of prisoners in county

jails. When overcrowding worsened, plaintiffs moved for a court order directing the release of prisoners. In response to the prisoners' motion, the district court ordered the Department of Corrections to submit periodic lists of 250 prisoners "least deserving of further incarceration."

Soon thereafter, The Birmingham News Company wrote to the Department of Corrections and the district judge requesting copies of the lists. The Department responded that it could not release the lists without the permission of the judge who also denied the newspaper's request. In his reply letter, the judge voiced his fear that publication of the lists could cause unrest among prisoners whose hopes for early release might be falsely raised and could disrupt the smooth operation of his office by producing a barrage of telephone calls and letters.

When The Birmingham News Company and The Advertiser Company filed formal applications to inspect and copy the lists, the court held a hearing at which the Commissioner of the Department of Corrections testified. Although he stated that publication could result in disturbances in prisons, he refused to term the likelihood of unrest as greater than a "possibility." The Commissioner also acknowledged that the actual publication of the first list, which The Birmingham News Company had obtained through some undisclosed source, had not caused any problems among inmates. Nonetheless, the district court denied the newspapers' applications.

The court did offer, however, to allow the media to inspect the lists if they promised not to publish them. Declining the offer, The Advertiser Company filed a second application to inspect and copy the lists as well as an application to be granted access to all further hearings in the case. In a brief order, which is the subject of this appeal, the court denied both applications, echoing its earlier fear of inmate unrest if the plan to release selected prisoners gained too much premature publicity. The order also denied an application by The Advertiser Company to attend hearings in a related

suit concerning prison conditions in Montgomery County jails.

Prior to the order, the court had summarily closed a contempt hearing in the Montgomery litigation. After the order, the court followed the same approach, precluding without prior notice the public and press from attending an in camera hearing in the state prison litigation.

In the meantime, the court had begun to order the release of prisoners selected by the judge. The first release order, which became part of the record available to the public, provided the names of the 277 prisoners to be released. Although the order thus provided the press with the names of prisoners to be released, it did not include the lists submitted by the Department of Corrections, which may have included more, less or different names.

Prior to state compliance with a second release order, this Court ruled that the district court had exceeded its authority in selecting inmates to be released from prison. The Court reasoned that the district court should enforce a consent decree requiring reductions in prison overcrowding through its contempt power. *Newman v. Alabama*, 683 F.2d 1312 (11th Cir.1982).

While that decision terminated the district court's release program, the problem of press and public access still persists in the litigation. In November, after this Court heard oral argument in this appeal, the district court denied without opinion a motion by The Advertiser Company to attend a "pretrial" hearing. On an emergency motion to this Court, we ordered the district court to "conduct no further proceedings in this case except in open court to which public and press have access unless a hearing is held and findings and reasons for closure of any particular proceeding are set forth in an appropriate manner and certified to this Court for emergency review."

■ Since neither party has argued either the standing of The Advertiser Company, not a party to the underlying litigation, or appealability of the district court orders, we need not tarry long with those two

points. This Court has upheld the press's standing to seek access in suits to which it is not a party. *United States v. Gurney,* 558 F.2d 1202, 1206 (5th Cir.1977), *cert. denied sub nom., Miami Herald Publishing Co. v. Krentzman,* 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978). *See* Note, *All Courts Shall Be Open: The Public's Right to View Judicial Proceedings and Records,* 52 Temp. L.Q. 311, 348 (1979). *Cf. United States v. Cianfrani,* 573 F.2d 835, 845 (3rd Cir.1978) (upholding standing of press as intervenors). Although the rights asserted by The Advertiser Company are also enjoyed by the general public, the newspaper publisher has suffered a "distinct and palpable" injury since its reporters have requested and been denied access. *See United States v. Cianfrani,* 573 F.2d at 845–46.

▬ While the litigation before the district court has not ended, we have held orders denying press access in ongoing litigation appealable under the collateral order doctrine enunciated in *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *United States v. Gurney,* 558 F.2d at 1207. The denial of review until the district court proceedings are concluded could irreparably harm the press's ability to cover contemporaneously judicial proceedings of significant public interest. *See Soto v. Barcelo (In re San Juan Star Co.),* 662 F.2d 108, 112–13 (1st Cir. 1981); *United States v. Cianfrani,* 573 F.2d at 845.

▬ A defendant appellee does argue the appeal should be dismissed under the mootness doctrine, asserting that "the lists are of no use to the Advertiser at this point." In *United States v. Gurney,* 558 F.2d at 1207, we held that even after a trial had concluded, orders denying access presented a controversy capable of repetition yet evading review because the underlying litigation will almost always terminate before the appellate court hears the case. *See also Globe Newspaper Co. v. Superior Court,* —— U.S. ——, —— – ——, 102 S.Ct. 2613, 2617–18, 73 L.Ed.2d 248, 254–55 (1982). In this appeal particularly, mootness is no bar to review for several reasons: *First,* the

underlying litigation has *not* terminated and shows no signs of terminating in the near future. *Second,* there is every indication that the district court plans to maintain its policy of excluding from time to time the public and press from court proceedings. *Third,* The Advertiser Company still desires to review the lists to evaluate the type of prisoners included and the accuracy of the information contained thereon. While the list of prisoners actually released apparently has been made available, the lists provided by the Department of Corrections for the judge's use in determining whom to release have not been. *Fourth,* The Advertiser Company seeks the right to attend *all* future hearings or judicial proceedings in these cases regardless of whether they involve the release of prisoners.

▬ On the merits of the issue before us, we start with the United States Supreme Court's discussion of the constitutional right of the press and public to attend *criminal trials* in *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). Although no opinion commanded a majority, seven justices agreed that the public has such a right. The Supreme Court has recently reaffirmed the *Richmond Newspapers* holding. *Globe Newspaper Co. v. Superior Court,* —— U.S. ——, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982).

The question is whether *Richmond Newspapers* applies in this case, a civil case, and to these proceedings which are "post-trial" or "pretrial", not the trial itself. The various opinions in *Richmond Newspapers* and the majority opinion in *Globe Newspaper* are helpful. Tracing the long history of open trials in Anglo-American jurisprudence, Chief Justice Burger's plurality opinion in *Richmond Newspapers* characterized a trial courtroom as "a public place where the people generally—and representatives of the media—have a right to be present...." 448 U.S. at 578, 100 S.Ct. at 2828. "What transpires in the courtroom is public property." *Craig v. Harney,* 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947).

The Supreme Court has emphasized that open judicial proceedings serve many important purposes. As Justice Brennan stated in *Globe Newspaper Co.,*

the right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole. Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the fact-finding process, with benefits to both the defendant and to society as a whole. Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process. And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government. In sum, the institutional value of the open criminal trial is recognized in both logic and experience.

—— U.S. at ——–——, 102 S.Ct. at 2619–20, 73 L.Ed.2d at 256–57 (footnotes omitted). *See also Richmond Newspapers, Inc. v. Virginia,* 448 U.S. at 569–73, 100 S.Ct. at 2823–25 (Burger, C.J.); *id.* at 593–97, 100 S.Ct. at 2836–38 (Brennan, J., concurring in the judgment); *Gannett Co. v. DePasquale,* 443 U.S. 368, 383, 99 S.Ct. 2898, 2907, 61 L.Ed.2d 608 (1979); *In re Oliver,* 333 U.S. 257, 270, 68 S.Ct. 499, 506, 92 L.Ed. 682 (1948). *Cf. Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 492, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328 (1975) (asserting that open trials bring to bear the beneficial effect of public scrutiny upon the administration of justice). In addition, open proceedings may be imperative if the public is to learn about the crucial legal issues that help shape modern society. Informed public opinion is critical to effective self-governance. *See Grosjean v. American Press Co.,* 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936).

■ Focusing on the beneficial consequences of criminal trials being conducted in public, we see little difference between a criminal trial and the proceedings here which relate to the release of convicted prisoners. This litigation concerning penal administration in Alabama is of paramount importance to the citizens of that state. They have a legitimate interest in learning which inmates are being released from prison and the reasons why. They may reasonably want to know whether state officials are recommending the release of only those who are most deserving or those who have political or other influential connections. The type of prisoner being released may help the public in its consideration of whether to prevent overcrowding by increasing the size or number of penal facilities or by modifying criminal laws. If it is beneficial to have public scrutiny of criminal proceedings that may result in conviction and punishment, then it is also helpful to allow public access to civil proceedings that modify the earlier trials by freeing prisoners before their sentences are completed or parole has been granted.

■ We need not here decide that the presumption of openness applies to all civil trials. All we decide is that civil trials which pertain to the release or incarceration of prisoners and the conditions of their confinement are presumptively open to the press and public.

■ The next question is whether the right of access extends to the "post-trial" and "pretrial" proceedings in this case. The reasons for a right of access to the trial in a case of this kind seem to apply equally to proceedings other than the trial itself. The proceedings were decisional as to which prisoners were to be released. The integrity of the judicial process, which public scrutiny is supposed to safeguard, is just as much at issue in proceedings of this kind as at trial. Given the important role these proceedings play in a case of this kind, it would seem to defeat the purpose to provide access to the trial, but not to the enforcement proceedings. *See United States v. Edwards,* 430 A.2d 1321, 1344, 7 Med.L.Rep. (BNA) 1324, 1328 (D.C.1981) (recognizing a First Amendment right of access to pretrial detention hearings because public access to these proceedings serves the same purposes as access to trials), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141 (1982).

■ We do not hold that every hearing, deposition, conference or even trial in a case of this kind must be open to the public. We do hold that "where, as in the present case, the [court] attempts to deny access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to that interest." *Globe Newspaper Co. v. Superior Court,* — U.S. at —, 102 S.Ct. at 2620, 73 L.Ed.2d at 257. There is nothing in this record that supports the closing of these proceedings to the press and public. The district court did not hold any hearing after proper notice, nor did it enter findings that justify any restrictions on public access to the proceedings. *See Globe Newspaper Co. v. Superior Court,* — U.S. at —, n.25, 102 S.Ct. at 2622, n.25, 73 L.Ed.2d at 259 n.25 (the press must be afforded an opportunity to present its case for an open proceeding); *Gannett Co. v. DePasquale,* 443 U.S. at 401, 99 S.Ct. at 2916 (Powell, J., concurring) (same). *See also* Note, *supra,* 52 Temp.L.Q. at 332. We commend to the trial courts the same procedure that has been recommended in a fair trial-free press context. *See* ABA, *Recommended Court Procedure to Accommodate Rights of Fair Trial and Free Press* (1976).

Other procedures also might accomplish the purpose. If the court on its own motion or on application of the parties deems that a closed proceeding is necessary, the court could enter an order to that effect, stating its reasons. If the court or the parties have any reason to believe that the public or press has an interest in attending such a proceeding, the fact of a closed proceeding should be made known. If any member of the public or press applies to the court that the proceeding be open instead of closed, the court could hold a hearing at which those seeking access and those opposed could argue in support of their positions, after which the court should enter an order declaring the proceeding open, closed, or closed in certain limited situations, and state the reasons for such an adjudication. We do not bind the district courts to the formality of any set procedure. But the issue must be squarely confronted and those with various interests must be given the opportunity to be heard.

The judge's eventual decision must be "articulated in findings," *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. at 581, 100 S.Ct. at 2829 (Burger, C.J.), which appellate courts can review. *Cf. In re United States ex rel. Pulitzer Publishing Co.,* 635 F.2d 676, 678 (8th Cir.1980) (preventing closure of voir dire proceedings because district court failed to announce the reasons and to consider public's right to attend).

■ We doubt that a universal standard for closure applicable in all cases can be developed and we do not intend to do so here. A few guidelines are in order, however. As with other governmental actions that potentially infringe on First Amendment rights, closure is proper only if necessary to achieve a legitimate purpose. *See Globe Newspaper Co. v. Superior Court,* — U.S. at —, 102 S.Ct. at 2621, 73 L.Ed.2d at 258 (striking down mandatory closure rule during testimony of minor rape victim in part because closure may not be needed to protect the victim). Less intrusive alternatives must be considered. *See Nebraska Press Association v. Stuart,* 427 U.S. 539, 562, 96 S.Ct. 2791, 2804, 49 L.Ed.2d 683 (1976). If closure is warranted, the restriction on access must be narrowly drawn with only that part of the proceeding as is necessary closed. *See Globe Newspaper Co. v. Superior Court,* — U.S. at — —, 102 S.Ct. at 2621–22, 73 L.Ed.2d at 258–59. A presumption of access must be indulged to the fullest extent not incompatible with the reasons for closure. *Cf. Richmond Newspapers, Inc. v. Virginia,* 448 U.S. at 580 n. 17, 100 S.Ct. at 2829 n. 17 (Burger, C.J.) (noting that "historically both civil and criminal trials have been presumptively open").

■ As to the prisoner lists, which were submitted to the court and became part of the court proceedings, there may be no constitutional right to copy. *See Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 608–10, 98 S.Ct. 1306, 1317–18, 55 L.Ed.2d

570 (1978). The Supreme Court in *Nixon* did, however, recognize a common-law right to inspect and copy judicial records. *Id.* at 597, 98 S.Ct. at 1311. This right, like the right to attend judicial proceedings, is important if the public is to appreciate fully the often significant events at issue in public litigation and the workings of the legal system. *United States v. Criden,* 648 F.2d 814, 824 (3d Cir.1981). *Cf. Cox Broadcasting Corp. v. Cohn,* 420 U.S. at 495, 95 S.Ct. at 1046 (striking down state law that prohibited press dissemination of name of rape victim disclosed in court record partly on ground that accurate reporting of public records aids public in determining whether the government is operating properly).

■■■■ The right to inspect and copy records is not absolute, however. *Nixon v. Warner Communications, Inc.,* 435 U.S. at 598, 98 S.Ct. at 1312. As with any other form of access, it may interfere with the administration of justice and hence may have to be curtailed. *See Belo Broadcasting Corp. v. Clark,* 654 F.2d 423 (5th Cir. 1981) (affirming denial of access to audiotapes admitted into evidence out of concern with a yet-to-be-tried defendant's right to a fair trial). The historic presumption of access to judicial records must be considered in the balance of competing interests. *Id.,* at 434. A district court's resolution of this balancing task is reviewable for abuse of discretion. *Nixon v. Warner Communications, Inc.,* 435 U.S. at 599, 98 S.Ct. at 1312; *Belo Broadcasting Corp. v. Clark,* 654 F.2d at 430–31.

■■■■ The Supreme Court has indicated a number of relevant factors in the balancing test. Writing for the majority in *Nixon,* Justice Powell suggested that district courts look to whether the records are sought for such illegitimate purposes as to promote public scandal or gain unfair commercial advantage, whether access is likely to promote public understanding of historically significant events, and whether the press has already been permitted substantial access to the contents of the records. *Nixon v. Warner Communications, Inc.,* 435 U.S. at 598–603 & n. 11, 98 S.Ct. at 1312–1315 & n. 11.

■■■■ In this case, unlike in *Belo Broadcasting Corp.* which denied a right to copy and broadcast audiotapes, no right to a fair trial is in jeopardy. No clear right had to be balanced against the right of access. No party asserted either a personal, procedural, statutory or constitutional right to non-disclosure. The reasons given by the district court for denying access to the lists are not supported by the record. The fear of prisoner unrest, while a legitimate concern, was not established. The press had published the first list and no disturbance had taken place. The Commissioner of the Department of Corrections testified only that publication could make prison violence a "possibility." In addition, it is not at all certain from the record that preventing the press from publishing the lists would accomplish the district court's purpose, *i.e.,* keeping the information from the prisoners. The underlying litigation is a class action brought by the inmates. Presumably their attorneys were present at the hearings and were free to disclose to their clients anything they learned about the potential release of prisoners. *Cf. Globe Newspaper Co. v. Superior Court,* —— U.S. at ——, 102 S.Ct. at 2622, 73 L.Ed.2d at 259 (1982) (concluding that a state law which mandated the exclusion of the public during the testimony of a minor rape victim was not justified because the press could obtain the transcript of the testimony or learn of its contents through discussions with court personnel and thereby easily defeat the statute's objective).

In addition to citing the potential disturbances, the district judge expressed concern that publication of the lists might lead the public to flood his office with correspondence and telephone calls. This concern is understandable. The docket of district judges is full and the submission of seemingly extraneous material by nonparties can only reduce a judge's time. But useful information might be generated by publicity. In any event, this exposure is unavoidable in the operation of a public court.

■■■■ Because the district court did not articulate any reason for excluding the ap-

pellants that outweighed the presumption of access to the court proceedings and failed to hold a hearing on the public's right to attend the proceedings, we reverse the denial of appellant's application for open proceedings. Because the evidence that might support a denial of access to the prisoner lists was insufficient given the presumption in favor of access to judicial records, we reverse the denial of appellant's application to inspect and copy the lists.

REVERSED.