49 F.3d 294
 31 Fed.R.Serv.3d 16
 B.H., C.H., J.E., et al.,
v.
Jess McDONALD, Director of the Illinois Department of
Children and Family Services, Defendant-Appellee.
Appeal of Patrick T. MURPHY, both as an individual citizen
and as the Cook County Public Guardian, Marlin R.,
Lamore W., minors, by their next friend,
Patrick T. Murphy, et al.,
Proposed Intervenors.
 No. 94-2307.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 28, 1994.
Decided Feb. 23, 1995.
Rehearing and Suggestion for Rehearing En Banc Denied April 7, 1995.
 
 Michael L. Brody, Jeanne L. Nowaczewski, Heidi Dalenberg, Schiff, Hardin & Waite; and Benjamin S. Wolf (argued), Susan Wishnick, and Nancy Sohn, Roger Baldwin Foundation of ACLU, Inc., Chicago, IL, for plaintiffs.
 Thomas J. Wiegand, Winston & Strawn; and Christine M. Tchen (argued), Susan Getzendanner, Kimberley K. Baer, Ester Nkonye Iwerebon, and Lawrence Oliver, II, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for defendant-appellee.
 Mary B. Kenney, Lee A. Lowder, Charles P. Golbert, and Patrick T. Murphy (argued), Office of the Cook County Public Guardian, Chicago, IL, for appellants.
 Before CUMMINGS, GOODWIN* and EASTERBROOK, Circuit Judges.
 GOODWIN, Circuit Judge.
 
 
 1
 Patrick Murphy appeals the denial of his motion to intervene and the district court's decision to hold non-public in-chambers conferences to discuss the implementation of a consent decree.
 
 I. BACKGROUND
 
 2
 In June of 1988, the American Civil Liberties Union ("ACLU") sued the Illinois Department of Children and Family Services ("DCFS") on behalf of a class of approximately 25,000 children. The class claimed the DCFS failed to provide adequate food, shelter, clothing and health care to the abused and neglected children in its care. The class sought declaratory and other relief under the Fourteenth Amendment of the United States Constitution, the Federal Adoption Assistance and Child Welfare Act, 42 U.S.C. Secs. 620-28, 670-79(a), and 42 U.S.C. Sec. 1983. After two years of extensive discovery, the parties agreed to work toward a settlement with the assistance of court-appointed experts. Finally, on December 20, 1991, the court approved a consent decree. Patrick Murphy was not a party, nor was he of counsel in the litigation.
 
 
 3
 Under the terms of the consent decree, the DCFS agreed to implement extensive reforms by July of 1994. The decree addressed every major problem in the DCFS system and provided staggered deadlines for the DCFS's completion of its systemic overhaul. To assist the DCFS in implementing the decree, the district court appointed a monitor.
 
 
 4
 Now, three years later, all sides agree that the DCFS has failed to meet its obligations under the consent decree. The DCFS has consistently failed to deliver plans for effecting real change and has missed the deadlines set out in the consent decree.
 
 
 5
 In the fall of 1993, the plaintiffs, the DCFS and the district judge agreed to hold inchambers hearings in addition to the open court status hearings held throughout the course of the litigation. The class counsel made the initial request of the court in a letter that emphasized the difficulties of candidly discussing DCFS compliance in open court with the media hanging on every word. The district court agreed. The court explained that both sides had been reluctant to negotiate in open court and that "[t]he colloquy at these status conferences has usually been adversarial and often heated," with plaintiff's counsel being accusatory and DCFS's counsel defensive. The court found that the parties' reluctance to make the necessary concessions stemmed from concern about bad press reports. At closed meetings, the district court could assist the parties in reaching solutions to the problem of DCFS noncompliance without the dysfunction caused by reticence.
 
 
 6
 The decision to close the conferences aroused the ire of Patrick Murphy, who had earlier sought unsuccessfully to intervene. Murphy first wrote a letter to counsel for the ACLU, attempting to dissuade the ACLU from consenting to in-chambers conferences. Murphy argued that the public's interest in the case gave the public a right to have all proceedings take place in open court. The public had an interest, he said, in the 900 million taxpayer-dollars received by DCFS and in the welfare of some 39,000 children in custody of the state.
 
 
 7
 Murphy correctly assessed the level of the public and the media interest in the consent decree. The media have detailed the progress of the case and reported regularly on the results of each status conference. As the parties noted, the attorneys for both parties have played to the media at each open court status hearing. The DCFS and the consent decree even became a campaign issue in the Illinois gubernatorial race. The newsgatherers have now voiced their disapproval of the district court's decision to hold some hearings in chambers.[1]
 
 
 8
 Murphy, who here makes his third motion to intervene, is not, however, merely an interested member of the public. As Cook County Public Guardian, he is the guardian ad litem for thousands of children in Cook County.[2] His office employs 115 lawyers and more than 40 investigators and social workers to represent the 27,000 child class members in Cook County, who are approximately three-quarters of the children in the plaintiff class. In addition to being a rejected intervenor, Murphy has instituted various suits in state courts against the DCFS.[3] He is here joined by a number of other involved parties: plaintiff children claiming to be harmed by the DCFS policy of keeping children with their biological parents, prospective foster parents and one Illinois taxpayer and social worker.
 
 
 9
 In February of 1994, Murphy and the other proposed intervenors filed this motion to intervene as well as a motion requesting the district court to conduct all future proceedings in open court. The district judge denied both motions. The court first determined that the proposed intervenors did not meet the requirements of Fed.R.Civ.P. 24 to intervene either by permission or of right. The court then rejected the challenge to the hearings, saying that a public right of access to court proceedings did not extend to in-chambers conferences between the parties and the court.
 
 
 10
 We affirm the district court's decision.
 
 II. INTERVENTION
 
 11
 Fed.R.Civ.P. 24(a) provides that anyone shall be permitted to intervene in an action when he "claims an interest relating to the property or transaction which is the subject of the action and [he] is so situated that the disposition of the action may as a practical matter impair or impede [his] ability to protect that interest, unless [his] interest is adequately represented by existing parties." The cases have interpreted the rule to require a four-factored showing: (1) timely application; (2) an interest relating to the subject matter of the action; (3) potential impairment of that interest by the disposition of the action, and (4) lack of adequate representation of the interest by the existing parties to the action. Nissei Sangyo America, Ltd. v. United States, 31 F.3d 435, 438 (7th Cir.1994) (citing Southmark Corp. v. Cagan, 950 F.2d 416, 418 (7th Cir.1991)). Except for the timeliness factor, which is reviewed for an abuse of discretion, we review a denial of a motion to intervene de novo. Nissei Sangyo, 31 F.3d at 438.
 
 
 12
 Although Murphy's motion was timely and the proposed intervenors have a strong interest in the case (albeit very general), they have not shown how denial of intervention will impair their interest. The law of the case has determined that they have no right to intervene.
 
 
 13
 They now claim that their "interest in open proceedings regarding the implementation of the consent decree will be lost[ ]" if the court denies intervention. In other words, as representatives of the public, they insist that they have an independent right to intervene to challenge the constitutionality of in-chambers conferences. Because they can seek to make a court proceeding public without intervening, they still fail to establish a right to intervene.
 
 
 14
 Moreover, Murphy, et al., have also failed to show a lack of adequate representation. They claim that the ACLU's refusal to take up their demand for open court hearings makes intervention necessary to vindicate the interests of the plaintiff class. The ACLU's refusal does not reflect inadequate representation, but only the ACLU's considered judgment about the beneficial effects of additional in-chambers conferences. There was no error in denying intervention.
 
 III. CHAMBERS CONFERENCES
 
 15
 Fed.R.Civ.P. 77(b) allows district judges the discretion to conduct proceedings in chambers, as long as the trial upon the merits is held in open court. The rule says: "All trials upon the merits shall be conducted in open court and so far as convenient in a regular court room. All other acts or proceedings may be done or conducted by a judge in chambers...."
 
 
 16
 The difficult question is whether the in-chambers conferences to discuss implementation of the consent decree fall under rule 77(b) discretion. Unless clearly distinct from a "trial[ ] on the merits," court business is presumed to be conducted in public. Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980).
 
 
 17
 The proposed intervenors would extend the public's right of access to civil proceedings into the judge's chambers, an area traditionally off-limits to the public eyes and ears. They base their claim on a public right instantly to know whether the DCFS Director is acting in "good faith," what steps counsel and the court are taking to protect children, how the DCFS is disposing of millions of taxpayer dollars, and which public policy choices the parties are making. Such curiosity, however healthy, does not become a constitutional right to be present at all times in someone else's lawsuit.
 
 
 18
 Rule 77(b) simply articulates the traditional authority of a judge to speak privately with the parties to a suit, whether in bench conferences or in chambers. The Supreme Court, even as it found the First Amendment mandated a public right of access to criminal trials, explicitly confirmed the court's traditional discretion. Richmond Newspapers, 448 U.S. at 598 n. 23, 100 S.Ct. at 2839 n. 23 (judges are not to be restricted to conduct conferences in chambers, as long as these are "distinct from trial proceedings."); Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 609 n. 25, 102 S.Ct. 2613, 2621 n. 25, 73 L.Ed.2d 248 (1982) (district judge's discretion to protect minor victims of sexual assault by denying press and public opportunity to confront or cross-examine is "consistent with the traditional authority of trial judges to conduct in camera conferences.") (citing Richmond Newspapers, 448 U.S. at 598 n. 23, 100 S.Ct. at 2839 n. 23). Lower courts have consistently upheld a judge's discretion to hold private conferences (although they have been infrequently called upon to do so). In Rovinsky v. McKaskle, 722 F.2d 197, 201 (5th Cir.1984), for example, the Fifth Circuit said that the public right of access to criminal trials did not include a "right to intrude uninvited into conferences at the bench and in chambers." And in United States v. Valenti, 987 F.2d 708, 714 (11th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 289, 126 L.Ed.2d 238 (1993), the Eleventh Circuit upheld a district court's "traditional authority to conduct closed bench conferences." See also United States v. Edwards, 823 F.2d 111, 116 (5th Cir.1987) ("bench conferences are outside public hearing and the protection of their privacy is generally within the court's discretion") (citing United States v. Gurney, 558 F.2d 1202, 1210 (5th Cir.1977), cert. denied, 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978)), cert. denied, 485 U.S. 934, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988).[4]
 
 
 19
 Part of the difficulty in this case arises from a conflict between the traditional authority of the court to conduct closed conferences and the intuitive desire on the part of courts to do public business in public. Citizens have a right to react with angry and cynical responses to government attempts to hide or disguise its workings. Outrage is predictable when citizens attend a legislative "hearing" at a city council meeting or at a legislative assembly, only to witness the swift passage without discussion of a committee report that followed a closed caucus disposing of a highly controversial question of public policy. Courts have traditionally been open, with every word of testimony taken down by a professional reporter, and with full accountability. See, e.g., Matter of Continental Illinois Securities Litigation, 732 F.2d 1302, 1312-14 (7th Cir.1984).
 
 
 20
 This commitment to openness must, however, be evaluated in terms of what the court is being asked to do in administering consent decrees and institutional reform litigation. The difficulty in the administration of bureaucratic agencies in which policy decisions are continually being made by administrators with infrequent judicial review, is that the policy questions that lurk in complex consent decrees do not lend themselves to simple yes and no answers. The traditional public trial was relatively short, highly focussed on sharply polarized positions such as guilty or not guilty, true or false, in possession or out of possession, and the like. Claims by aggrieved persons and classes of persons in the field of entitlements frequently are not sharply focussed, nor subject to simple yes and no answers. The disposition of individual grievances by formula and guideline necessarily involves decision making by means of negotiation, definition, and searching for "least worse" solutions when no ideal solution can be found. If Article III judges are to be called upon to use judicial discretion in sorting out chaotic bureaucratic behavior, on the theory that Congress must have had some reason to believe courts should resolve problems created by the other branches, then courts should have as much discretion as possible in fashioning the tools with which to proceed:
 
 
 21
 When a district court determines, after a contested trial, that a state institution is guilty of a serious and persistent violation of the Federal Constitution, it typically fashions a remedy that is more intrusive than a simple order directing the defendants to cease and desist from their illegal conduct. See Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). A district court has a duty to command a remedy that is effective, and it enjoys the broad equitable authority necessary to fulfill this obligation. See id.... Brown v. Board of Education, 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955)....
 
 
 22
 Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 399, 112 S.Ct. 748, 768, 116 L.Ed.2d 867 (1992) (Stevens, J., dissenting).
 
 
 23
 We are satisfied that any proceedings on the merits of this case will continue to be held in open court. As the ACLU pointed out in its response to the proposed intervenor's motion, any enforcement or adjudication will take place, as usual, in open court:
 
 
 24
 Any such discussions, if successful, would merely be preliminary to a negotiated settlement or order fully disclosing the course of action the parties believe will result in improving the lives of children in the State's care in the shortest time possible. To the extent that the parties are able to settle their differences, based on these preliminary in-chambers discussions with the Court, the terms of their negotiated agreements will continue to be public, as will the bases for the settlements and the bases for this Court's approval or rejection of any jointly-proposed action. To the extent that the parties are unable to settle their differences, their disputes will be handled as in the past, via objections, status hearings, briefs, and rulings, all in open court.[5]
 
 
 25
 Moreover, the public and the media will not be denied access to all information about these in-chambers hearings. In addition to being able to attend status hearings, the public will have access to records of the in-chambers conferences. According to the ACLU's counsel, parties will be making written submissions to the court to be discussed in chambers. These, along with arguments and rulings made in chambers, will become part of the public record. Thus, because nothing suggests that decisions on the merits will be shielded from public view, we agree that the district judge has discretion under Rule 77(b) to hold in-chambers conferences to discuss the implementation of the consent decree.
 
 IV. PRESS-ENTERPRISE
 
 26
 The proposed intervenors claim the public has a right of access to hearings to implement a consent decree under Press-Enterprise v. Superior Court of California, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986). This case says the public has a right of access if 1) the type of proceeding has historically been public; and 2) public access is important to its function.
 
 A. Historically Open:
 
 27
 We have been cited no case granting the public access to conferences on the implementation of consent decrees. The plaintiff class contends that post-consent decree conferences are analogous to historically closed pre-settlement conferences. The proposed intervenors counter that the analogy fails because the consent decree has already been entered. Neither side is entirely correct. Although these conferences are post-consent decree, they serve some of the same purposes as pre-settlement negotiations. Yet the fact that both types of conferences essay to negotiate remedies does not mean that these particular conferences should be accorded privacy and secrecy.
 
 
 28
 Consent decrees are historically and legally distinct from settlements. Settlement conferences can be traced to early 20th century efforts by municipal courts to apply Scandinavian conciliation techniques to local cases. Carrie Menkel-Meadow, For and Against Settlement: Uses and Abuses of the Mandatory Settlement Conference, 33 U.C.L.A.L.Rev. 485, 490 (1985). Consent decrees, on the other hand, date back to at least the early 19th century. We cannot, therefore, equate consent decrees to settlements for purposes of the first prong of Press-Enterprise.
 
 
 29
 The legal differences between settlements and consent decrees confirm the historical inquiry. Settlements are private affairs, while consent decrees are entered as judgments and are consequently backed by the court's powers of enforcement. A party must file suit to enforce a settlement, but parties to a consent decree simply implement it under the auspices of the court. The court has the power to enforce and modify the terms of the decree and to penalize the noncomplier through contempt proceedings or the issuance of injunctive relief. See Thomas M. Mengler, Consent Decree Paradigms: Models Without Meaning, 29 B.C.L.Rev. 291, 313-314 (1988). Because consent decrees operate against the background of the court's powers, they can be further distinguished from settlement conferences.
 
 
 30
 Nor do the cases the proposed intervenor cites convince us that these conferences are akin to other proceedings that courts have held must be open. Murphy et al. claim that Newman v. Graddick, 696 F.2d 796 (11th Cir.1983) is analogous because it too involved the right of access to post-decree proceedings. Newman concerned civil proceedings that determined which prisoners were to be released following a court order issued pursuant to a consent decree requiring state officials to reduce overcrowding in county jails. The Eleventh Circuit upheld the public's right of access to the lists of prisoners scheduled for release and the related hearings. The court reasoned that, where public access was important to the original criminal trial, it would be equally significant in civil proceedings that modified the results of the earlier trials by freeing prisoners before completion of their sentences.
 
 
 31
 Murphy also maintains that Bank of American Nat. Trust v. Hotel Rittenhouse, 800 F.2d 339 (3d Cir.1986) supports his claim. In Rittenhouse, the Third Circuit found a public right of access to a settlement agreement filed with the court and subsequent motions seeking enforcement thereof. The court said, "[h]aving undertaken to utilize the judicial process to interpret the settlement and to enforce it, the parties are no longer entitled to invoke the confidentiality ordinarily accorded settlement agreements." Rittenhouse, 800 F.2d at 345.
 
 
 32
 In contrast to our case, the proceedings in Newman and Rittenhouse were characterized by the court's exercise of its adjudicatory power. In Newman, the proceedings determined which prisoners would be released before having served sentences imposed in prior criminal trials. In Rittenhouse, the court was called upon to enforce a settlement agreement. Those proceedings are clearly distinct from the conferences in our case, in which, by the terms of Rule 77(b), the court will not be adjudicating anyone's rights or enforcing any provision of the consent decree.
 
 B. Role of Public Access:
 
 33
 Murphy et al. claim that intense public interest in the consent decree means that public access to the in-chambers conferences is important to the proceedings. He misstates the nature of the inquiry. As the Supreme Court said in Press-Enterprise, the question is "whether public access plays a significant positive role in the functioning of the particular process in question." Press-Enterprise, 478 U.S. at 8, 106 S.Ct. at 2740.
 
 
 34
 Public access enhances judicial proceedings in many ways. Public scrutiny of trials creates accountability, minimizing judicial error and misconduct, and thus benefits the litigants, defendants and society as a whole. The public galleries are said to have a salutary effect on legislative, judicial and executive conduct. Moreover, the public is said to gain respect for the judicial process if members can observe justice being done. See Globe Newspaper, 457 U.S. at 606, 102 S.Ct. at 2619-20.
 
 
 35
 By contrast, public scrutiny of in-chambers conferences could undermine their very function. These conferences require a certain degree of give-and-take negotiation, particularly where the purpose is to further an alternative dispute resolution mechanism. The goal is to allow the parties to ventilate their views and resolve their differences in a neutral forum, where they are encouraged to work toward compromise rather than to advance polarized adversary positions. The implementation of consent decrees involves not merely the static application of legal doctrine, but also incorporates ethical and value judgments on what is right, just and reasonable. In discussing these subjective areas of social policy, candor and free flow of discussion are expedited and enhanced through face to face encounters between the parties in chambers. An enforceable right of bystander access to these processes could change the way the conference works and impede, rather than advance, problem-solving.
 
 
 36
 We do not hereby deny the public a right of access to information about the in-chambers hearings; rather, we hold only that the public has no right to follow the negotiators into the negotiation room. In fact, the public has continuously enjoyed access to most, if not all, of the information generated in this case. After the district judge preliminarily approved the consent decree, notice was sent to the members of the class as well as others involved, including foster parents, service providers, children's advocates and state courts dealing with cases of abuse and neglect. After approval of the decree, the public had access to all of the monitor's reports, the DCFS's responses to the reports and the plaintiff's written replies to both of these submissions. Subject to available seating, anyone has been able to attend--and will continue to be allowed to attend--the open court status hearings regarding the decree's implementation. Moreover, as we noted supra, the public will have access to records of the in-chambers conferences. The public will also be able to attend any enforcement proceedings that may ultimately be instituted. Because post-consent decree conferences have not historically been public, and because public access would only hinder the judicial process, we conclude that the public has no right of access under Press-Enterprise.
 
 V. CONCLUSION
 
 37
 In sum, we hold that non-parties have no right to be present at these in-chambers conferences. While we understand that the proposed intervenors are genuinely concerned about the very serious matter of the welfare of the children in the plaintiff class, this concern cannot dictate the answer to the only issues in this case: whether Murphy, et al., have a right to intervene and whether Judge Grady abused his discretion in deciding to hold additional status hearings in chambers. For the reasons given above, non-parties have no absolute right to observe, monitor, or participate in implementation hearings following a consent decree where the court will not be adjudicating any issues on the merits. There was no abuse of discretion.
 
 
 38
 AFFIRMED.
 
 
 39
 EASTERBROOK, Circuit Judge, with whom GOODWIN, Circuit Judge, joins, concurring.
 
 
 40
 The root of the current dispute is the consent decree, which leads me to append some thoughts that in light of the parties' litigating strategy belong more properly in a concurrence than in the opinion of the court. How the Department of Children and Family Services carries out its tasks is a subject of great moment. Like the public at large, Patrick Murphy, Cook County's Public Guardian, is understandably interested. The ACLU, which commenced this suit in the name of the neglected children of Illinois, believes that the Illinois legislature has acted unwisely--that it has been too stingy with money and has given the DCFS the wrong set of priorities. The ACLU and the DCFS do not necessarily agree on the right way to handle the needs of children, but they coincide in thinking that the legislative solution is the wrong one. So they assented to moving the subject from the legislature's province to their own. The legislature of Illinois was not consulted about, and did not accede to, this reallocation of political power--and, even if the legislature had consented, the judge should not have been an accomplice to the transfer of a political question to a judicial tribunal. Kasper v. Board of Election Commissioners, 814 F.2d 332 (7th Cir.1987).
 
 
 41
 The provisions of the decree place the court in charge of a public agency. This was not done to redress a clear legal wrong; the court has not found any concrete wrong, and it has not held that the provisions of the decree are the least application of federal power needed to rectify that wrong. Scholars and political society alike are at a loss to know how to protect and educate the children of collapsing or nonexistent families. When parents take drugs, or neglect their kids, or are simply unable to raise them, what should be done? Educate the parents and rebuild the family (at what chance of success and risk in the interim)? Put the children in foster homes (but what ensures that the foster parents will be better)? Resort to boarding schools and orphanages? What resources should be devoted to social work, as opposed to more police and better schools? No set of rules can compel social workers to work hard or become wise, let alone to find solutions to problems that perplex the best students--many of whom think that the current social services apparatus should be abolished rather than "reformed." The assertion that the Constitution of 1787, the Civil War Amendments of 1866 to 1871, and the gloss on these documents provided by lawyers, contain the solution to a novel, grave, and seemingly intractable social problem of the 1990s shows only that desperate problems induce desperate hopes. Beyond insisting that the state not deliberately make things worse, the Constitution is silent. DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); K.H. v. Morgan, 914 F.2d 846 (7th Cir.1990); cf. Hassan v. Wright, 45 F.3d 1063, 1070 (7th Cir.1995). Federal statutes have more to say but many of their rules are not enforceable in private actions. Suter v. Artist M., 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). No surprise, then, that the judge did not find a legal imperative. Instead the court permitted the ACLU and the DCFS to set themselves up as the legislative arm of Illinois for child welfare policy. The consent decree reads not like a judgment rectifying a violation of law but like a statute setting an agency's agenda--complete with deadlines for the promulgation of rules and promises designed to mollify diverse interest groups.
 
 
 42
 Having entered the political thicket, the judge has discovered that the litigants behave like politicians. As we remarked when instructing the district court to vacate another consent decree that seized control of a political subject, "[p]olitics is unruly and often unpleasant; judicial regulation of political affairs does not end the conflict but only shifts the venue." Evans v. Chicago, 10 F.3d 474, 482 (7th Cir.1993) (en banc). The parties bicker (each side has its own preferred program), they posture for the press, and like other politicians they think that they could accomplish more if only their deals (and therefore the identity of the losers) were less visible. Non-parties, hovering about the proceedings to lobby for their preferred solutions, clamor for places at the bargaining table. The judge believes that the litigants will be more amenable to compromise if he moves bargaining into chambers and off the record. The legislative practice of holding closed markup sessions, preceding an open and largely ceremonial vote, has come to the judicial branch.
 
 
 43
 Yet no one has asked us to restore this subject to the people's representatives. Patrick Murphy, the appellant, supports the consent decree. He seeks only a larger role for himself--and he is right to think that his voice carries farther in the courtroom than in the legislative cacophony. Having acquiesced in transferring a political question to the judiciary, however, Murphy is poorly situated to demand that the case be handled with the tools developed for the resolution of adversarial litigation. Murphy has weakened his own position by the selection of arguments. He wants to intervene; yet a panel of this court recently rebuffed that request, B.H. v. Ryder, 984 F.2d 196 (7th Cir.1993), and subsequent events do not justify revisiting so recent a decision. Murphy seeks party status so that he can wrest some control from the ACLU, which is representing the class; yet in the wake of our 1993 decision he abjures any challenge to the adequacy of the ACLU's representation. Disagreement with the appointed representative's decisions does not justify intervention.
 
 
 44
 As for the conferences in chambers: Murphy stakes his all on the Constitution of the United States. Many doctrines limit the power of courts to put hearings and information off the record. See Grove Fresh Distributors, Inc. v. Everfresh Juice Co., 24 F.3d 893 (7th Cir.1994); In re Krynicki, 983 F.2d 74 (7th Cir.1992) (Easterbrook, J., in chambers); In re Reporters Committee for Freedom of the Press, 773 F.2d 1325 (D.C.Cir.1985) (Scalia, J.); In re Continental Securities Litigation, 732 F.2d 1302 (7th Cir.1984). Murphy bypasses the common law in order to tackle a juicy constitutional topic. Like most litigants who disdain mundane "legal" arguments on their way to the Constitution, Murphy has pleaded himself out of court. For there is no constitutional right to peer into a judge's chambers--any more than the Constitution requires Congress to open its markup sessions or conference committee meetings (or, for that matter, the cloakrooms) to the public. Indeed, the Constitution often gives the government a privilege to do its business off the record. United States v. Nixon, 418 U.S. 683, 705-08, 94 S.Ct. 3090, 3106-08, 41 L.Ed.2d 1039 (1974); Public Citizen v. Department of Justice, 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989). Rights of access are few and far between. Thornburgh v. Abbott, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).
 
 
 45
 No one doubts that lawyers for the ACLU and the DCFS could repair to a hotel room, there to hammer out their differences without the presence of Murphy or anyone else. The district judge could send a mediator to that conference without constitutional objection. When the district judge himself plays the role of mediator, the principle is no different. See Cincinnati Gas Co. v. General Electric Co., 854 F.2d 900 (6th Cir.1988) (first amendment does not create a right of access to summary jury trial used as a settlement device); Capital Cities Media, Inc. v. Chester, 797 F.2d 1164 (3d Cir.1986) (en banc) (no constitutional right of access to historically closed judicial proceedings); United States v. Corbitt, 879 F.2d 224 (7th Cir.1989) (no constitutional right of access to presentence reports). Congress and many state legislatures have concluded that open deliberation often serves the public interest. The increasing number of open legislative proceedings, coupled with statutes such as the Freedom of Information Act, 5 U.S.C. Sec. 552, the Federal Advisory Committee Act, 5 U.S.C.App. Secs. 1-14, and the Government in the Sunshine Act, 5 U.S.C. Sec. 552b, establish at least this much. That these are recent developments also shows that the first amendment does not compel open deliberations by public bodies. Until 1976, when the Sunshine Act obliged them to open their meetings, most federal agencies deliberated entirely in private. Congress and the President still make extensive use of off-the-record meetings and submissions. E.g., Meyer v. Bush, 981 F.2d 1288 (D.C.Cir.1993) (the Task Force on Regulatory Relief is not an APA agency, and thus is not covered by FOIA, because it gives advice to President and OMB rather than issuing self-executing commands; it may receive information and deliberate in private). So does the judiciary; after this court hears oral argument, exchanges among the judges and the crafting of an opinion proceed in secret. The Constitution does not compel the district court to open all chambers conferences to the general public--or to Murphy.
 
 
 46
 Whether holding particular discussions in secret would be an abuse of discretion is an issue not before us. Murphy posed an abstract question--whether the Constitution requires all chambers conferences to be open--and receives an abstract answer. Ascertaining the correct treatment of particular meetings under non-constitutional doctrines lies ahead. Lies ahead, that is, if the district judge continues to referee political deliberations. The judicial system ought to turn politics back to elected officials rather than to adopt ever more of the rules by which the political branches regulate their own proceedings.
 
 
 
 *
 The Honorable Alfred T. Goodwin, Senior Circuit Judge for the United States Court of Appeals for the Ninth Circuit, is sitting by designation
 
 
 [1]
 In June, 1994, for example, the Chicago Tribune ran an editorial saying that the public had a right to know how their tax dollars were being spent as well as a right to know how children in the state's custody are protected. Don't Hide DCFS Case from the Public, Chicago Tribune, June 6, 1993, at 12
 
 
 [2]
 The Juvenile Court Act of Illinois requires a guardian ad litem to be appointed upon each state court filing of a petition alleging child neglect or abuse. Juvenile Court Act section 2-17, Ill.Rev.Stat. ch. 37, section 802-17 (1990)
 
 
 [3]
 Murphy filed his first motion to intervene in September of 1990. He claimed that the ACLU was inadequately representing the class. The district court denied his motion, saying that Murphy had failed to demonstrate a direct interest or to explain why his experience was essential to a resolution of the case. The court also noted that disruption at that point in time would hamper the case's progress. Murphy made his second motion to intervene in April of 1991, on similar grounds. After the district court denied the motion, Murphy appealed, challenging both the denials of his motions to intervene as well as the substance of the consent decree. We rejected his arguments because the appeals of the denials of intervention were both untimely and because Murphy lacked standing to challenge the consent decree. B.H. by Pierce, 984 F.2d 196, 199 (7th Cir.1993)
 In addition to his efforts to intervene in the ACLU's case against the DCFS, Murphy, as guardian ad litem, has sued the DCFS in state court on behalf of a class of children who are or will be sexual abuse victims or perpetrators while in the custody of the DCFS. The Illinois state appellate court ruled that the federal consent decree rendered that case moot. The court said that because the plaintiffs were "necessarily a sub-class of the expansive B.H. class of all children in DCFS custody, plaintiffs' needs are fully covered by the consent decree and the subsequent implementation plan." Katherine M. v. Ryder, 254 Ill.App.3d 479, 193 Ill.Dec. 883, 888, 627 N.E.2d 42, 47 (1993). Murphy has also filed two suits in federal court. K.H. by Murphy v. Suter, 765 F.Supp. 432 (N.D.Ill.1991) (court struck complaint because it paralleled the B.H. class action then pending); Frederick N. v. Suter, 1993 WL 101437 (1993).
 
 
 [4]
 A number of district courts have followed suit. See United States v. Moody, 746 F.Supp. 1090, 1093 (D.Ga.1990) ("the press has no First Amendment right of access to communications between counsel and the court which take place at the bench or in chambers, particularly when those communications involve evidence which the court determines to be inadmissible and which, if disclosed, could deprive the defendant of the fair trial by an impartial jury that the Constitution guarantees."); United States v. Miranda, 746 F.Supp. 1546, 1548 (D.Fla.1990) (fact that court had counsel for defendants step into chambers immediately before public hearing to provide court with copies of motions or papers to be presented accorded with court's "traditional authority to conduct in camera proceedings and conferences in chambers, at least to the extent that they are distinct from trial proceedings.") (citing Richmond Newspapers and Globe Newspaper Co.)
 
 
 [5]
 The only circumstances in which the plaintiffs contemplate that the public will not have full access is if a particular child or worker's case is discussed, a limitation justified by privacy concerns